F. C. VAUGHAN and Mattie Vaughan et al., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 17823, 17836–17841.

United States Court of Appeals Ninth Circuit.

May 21, 1964.

Ralph R. Bailey, Frank E. Magee, and Jack H. Dunn, Maguire, Shields, Morrison, Bailey & Kester, Portland, Or., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Alec A. Pandaleon; and Michael Mulroney, Dept. of Justice, Washington, D. C., for respondent.

Before HAMLIN, BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Before us are seven petitions to review decisions of the Tax Court of the United States. They were presented to the Tax Court, and they are presented here, on a single record and a single set of briefs. Many of the facts were stipulated, but considerable testimony was also taken. The findings of fact and the opinion of the Tax Court are reported at 36 T.C. 350. Our examination of the record leads us to the conclusion that, except in one respect, the Tax Court's findings are supported by substantial evidence, and are not clearly erroneous, and we do not repeat them here, except to the extent necessary to decide the legal issues that are presented.

The basic position of the petitioning taxpayers is that the Tax Court misapplied the provisions of the Internal

Revenue Code of 1939, § 117(j), added by § 151(b) of the Revenue Act of 1942, as amended by § 127 of the Revenue Act of 1943, and by § 324 of the Revenue Act of 1951. The 1951 amendment was made retroactive to years beginning after December 31, 1941. As so amended, section 117(j) which permits capital gains treatment on the sale of certain assets and within certain limits, permits such treatment for "property used in the trade or business." This term is defined in section 117(j) (1), and for the purposes of subsection (j), to include "livestock, regardless of age, held by the taxpayer for * * * breeding * * * purposes, * * *."

During the taxable years in question (1948, 1949, 1950 and 1951) taxpayers owned a herd of beef cattle. These cattle were located upon lands owned by a third party who is referred to by the Tax Court in its findings as "Milford." The headquarters ranch at Bruneau, Idaho consisted of about 1,000 acres, and the summer ranch at Battle Creek, Idaho, of about 3,600 acres. Milford also had grazing rights on about 250,000 acres of public land.

The operation was an open range operation and had a capacity of about 2,100 "count" cattle. This term includes all cattle except those which are less than six months old when turned out on the range in the Spring. At the time that the operation began there were a total of 1,520 animals in the herd, of which 1,364 were count cattle. Under Milford's agreement with the owners of the cattle (the taxpayers), he was in complete charge of the operation and was to be compensated by receiving one-half of the proceeds of all cattle sales, the other half going to the taxpayers. The agreement required that he should maintain the herd at its present size and quality by increase or by purchased replacements.

The purpose of the operation was the raising of cattle for sale for beef. The manner of the operation of the spread was the customary one in mountain and desert territory of the type here involved. All of the cattle were turned out on the open range about the middle of March, except the bulls and the cows and heifers that were with calf. On May 1 the bulls were turned out. The isolation of the bulls until that time was to prevent the birth of calves during the bad winter months of December and January. After the calves were born, the cows and calves were also turned out on the range. Thus, beginning about May 1, the entire herd was on the range and all of the cows and heifers were exposed to the bulls. Each fall, the cattle were rounded up, and the bulls, cows, steers and heifers were segregated. Based on the number and condition of the steers, and the going price, the amount to be realized from their sale was determined. Animals thought to be no longer desirable for breeding were culled from the bulls and cows, and a similar calculation was made as to probable realization from their sale. The parties knew about what Milford would need, as his share of the proceeds from sales, to carry on the operation until the next fall. The expected proceeds from the sales of steers and culls was never sufficient, and as a result, enough heifers were then selected and sold to produce the needed funds.

For obvious reasons, no one here contends that the steers were held for breeding purposes. It is conceded that they were property held "primarily for sale to customers in the ordinary course of * * * business". (Section 117(j) (1)). Such property is not entitled to capital gains treatment. The Tax Court held that the culled cows and bulls were held for breeding purposes, and allowed capital gains treatment of their sales.

It is the contention of the taxpayers that all of the heifers were a part of the breeding herd and were therefore held for breeding purposes within the meaning of the statute. They base this contention on their own testimony and that of Milford that it was the intent of all parties concerned that he should build up the herd to the full carrying capacity of the range. This, however, he was never able to do. It became apparent to all parties, in the Fall of 1947, the first

time that cattle were being marketed as a part of Milford's operation, that the proceeds that would be realized from the sale of the steers and culls would not produce enough money to permit Milford to continue the operation. Therefore, each fall, a substantial number of heifers was sold. The figures, which appear in the findings of the Tax Court and are not disputed, are as follows: At the beginning of the operation there were 434 heifers in the herd. During the period of Milford's operation, 1,636 heifers were branded, making a total of 2,070 heifers available during the contract period for replacement of cows culled from the herd, addition to the herd, sale or return to the taxpayers at the end of the contract with Milford. During the operation 433 cows were culled and sold. It thus would take 867 heifers to replace the culls and the heifers on hand at the beginning of the period, leaving 1,203 available either for sale or addition to the herd. 817 of this number were actually sold. Thus, 386 were used for increase of the herd.

The record also shows that in an operation of this type, when the herd is of a size equal to the maximum capacity of the range, only between 15% and 20% of the heifers born each year will be retained for breeding purposes, the balance being sold along with the steers, for beef. It seems obvious to us that under such circumstances, the remaining 85% to 80% of the heifers that are sold cannot fairly be said to be held for breeding purposes merely because, up to the time that they are sold, they are on the open range and exposed to the bulls. The purpose of the operation is to produce beef animals for sale, and sell them, and the heifers that are regularly sold are just as much held for sale as are the steers.

■ This case is complicated by the fact that it was an objective of all parties to build up the herd. Financial limitations, however, which were inherent in the manner in which the operation was conducted and the proceeds were divided, made the attainment of this objective impossible, and the record shows that all parties knew it shortly after the beginning of the operation. The Tax Court concluded that the parties' actions did not coincide with their claimed intent to retain for breeding purposes all heifers other than culls, and we think that the record fully supports this conclusion.

■ The difficult problem is that in an operation such as this, where the breeding animals are not segregated from the rest of the herd as they must be where registered cattle are being bred, there is no way, at or after the time that a heifer is born, to know whether that particular animal will ultimately become a breeder, or will be sold in the ordinary course of trade for beef. This is determined at the time of the fall roundup and sale, and not before. We think that, in the case of a spread that is operating to the capacity of the range, a court could properly say that all heifers actually sold should be treated as held from the beginning for sale in the ordinary course of business, while all heifers actually retained should be treated as being held from the beginning for breeding purposes. We think that the Tax Court would have been justified in coming to a similar conclusion here, but it did not go that far.

■ The record shows that, in deciding which heifers to sell, an endeavor was made to eliminate from those sold, and to retain all heifers that were with calf. This was done for two reasons. One was to retain the calf, which also meant to retain the mother as a breeder. The other was that buyers did not want such animals. Thus the endeavor was to select for sale those animals that were considered more desirable by the buyers. The record also shows that, generally speaking, a heifer produces its first calf when it is about 24 months old. The Tax Court therefore determined that all heifers actually sold that were under 24 months of age should be treated as held for sale in the ordinary course of business, while heifers over 24 months of age, even though actually sold, should be treated as held for breeding purposes. As to such of the latter heifers as were sold, the court allowed capital gains treatment. We think that the Tax Court's method of

arriving at the result that it did was a reasonable one under the peculiar circumstances of the case. To put the matter another way, and as we have previously held, the question is one of fact, to be determined from all of the relevant circumstances, (United States v. O'Neill, 9 Cir., 1954, 211 F.2d 701) and we can not say that the Tax Court's determination of that question in this case was clearly erroneous.

The parties have cited many authorities. Some of them are also considered in the opinion of the Tax Court. We have examined them and we think that none of them requires a different conclusion from that reached by the Tax Court. We think that no good purpose would be served by a further discussion of such cases.

The situation in 1951 was different. The arrangement with Milford terminated in that year, and Milford turned back to the taxpayers a total of 1,837 animals. Early in 1951, 847 of these animals, including 23 suckling calves and 220 heifers, all under 24 months of age, were sold to Milford. Also early in 1951, the taxpayers removed 808 animals to Oregon, where they were placed upon leased lands. During 1951 the taxpayers sold 414 of these animals, including 100 suckling calves and 60 heifers under 24 months of age. The Tax Court held, in each instance, that the calves and heifers sold were not held for breeding purposes. All of these sales were made because the taxpayers had no land on which to continue the operation.

The taxpayers' contention is that the 1951 transactions were the liquidation of a breeding herd, and that consequently the money received for all animals in the herd is entitled to capital gains treatment under section 117(j). The difficulty with this position is that it assumes the question in issue, namely, that the entire herd, that is, all of the animals in the herd, is a "breeding herd," so that all

animals in it were held for breeding purposes. Obviously the steers, of which 64 were sold, were not so held. For reasons that we have already stated, we think that it cannot fairly be said that all of the suckling calves and heifers were so held, and the Tax Court's problem was to determine what portion of them was not. In doing so it applied the same test that it had used while Milford was operating the spread.

▪ In this respect, we think that the Tax Court erred. The taxpayers were entitled, under their contract with Milford, to the replacement of the cattle delivered to Milford at the beginning of their contract with him, plus one-half of the increase. To the extent that they received and accepted heifers as replacements for the 790 range cows and 306 heifers "coming two years old" that were a part of the herd when it was originally delivered to Milford, we think that the heifers so received should be treated as held for breeding purposes. As to the additional heifers under two years old that were received, we think that a percentage of them would have been retained for breeding had the operation continued, and that that percentage should be treated as held for breeding when the herd, or most of it, was sold. In 1951, there was no "operation" of the herd, resulting in sales of animals for beef, by the taxpayers, as there had been by Milford in prior years. It was, however, the same herd, and the Tax Court can look to the last prior year, or the several prior years, as it deems proper, to ascertain the percentage to which we refer. The Tax Court did not make findings that permit a proper application of the foregoing principles.

In Nos. 17,823, 17,836, 17,837 and 17,838, the judgments of the Tax Court are affirmed. In Nos. 17,839, 17,840 and 17,841, the judgments are vacated and the matters are remanded for further proceedings consistent with this opinion.