DUANE A. AND SARA STRONG, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

GARY L. AND MARLYS L. KARKOSH, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 34393-84, 34544-84.[1]    Filed September 14, 1988.

*C. Kevin McCrindle,* for the petitioners.
*Vincent E. Mauer,* for the respondent.

HAMBLEN, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Petitioner | TYE Dec. 31— | Deficiency |
| --- | --- | --- |
| Duane and Sara Strong | 1982 | $1,501 |
| Gary and Marlys Karkosh | 1981 | 436 |

The primary issue for our determination is whether petitioners were correct in not reporting any rental income from their acquisitions of livestock which they designated as replacements or additions to their breeding herds.

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners Duane and Sara Strong are husband and wife and resided in Elgin, Iowa, at the time they filed their petition. They timely filed their joint Federal income tax

---

[1]These two cases were consolidated pursuant to Rule 141(a), Tax Court Rules of Practice and Procedure, in a motion granted on Jan. 2, 1986.

return for the calendar year 1982. Petitioners Gary and Marlys Karkosh are husband and wife and resided in Hudson, Iowa, at the time they filed their petition. These same two petitioners timely filed their joint Federal income tax return for the calendar year 1981. All petitioners used the cash method of accounting.

Mr. and Mrs. Strong each own 50 percent of the outstanding shares of Four Strong, Ltd., an Iowa farm corporation engaged in grain and livestock operations and formed in February 1981. On their tax return for the calendar year 1982, these two petitioners each listed their occupations as corporate officers. Additionally, Mr. Strong was involved in farming in 1982, and had been so since 1958.

Upon incorporating Four Strong, Ltd., the Strongs transferred to the corporation their livestock and other farming assets, except for brood sows and brood cows.[2] The couple retained title to these breeding animals which they later let to Four Strong, Ltd., under agreements labeled "leases" and dated February 9, 1981. The Strongs had decided to retain title to and lease these brood animals as a way to draw additional income from their wholly owned corporation. The Strongs' animal leases covered 170 sows and 80 cows.

Under their sow lease, the Strongs were entitled to one gilt annually per sow leased to the corporation, regardless of the actual number of piglets farrowed alive by the corporation.[3] The Strongs acquired title to these gilts when

---

[2]The organization which assisted the Strongs in incorporating their farm and which suggested that the Strongs retain title to their brood animals was the Iowa Farm Business Association.

[3]In relevant part, the lease agreement concerning sows states as follows:

3. *Gilt/Sow Rental.* Lessor shall take possession of one gilt from the first litter farrowed per rented gilt and/or sow biannually. Lessor shall have as such rental the first pick of the gilts from each litter at a time when the litter is 40 pounds. The gilt rental pig so selected shall be tail docked at the time of selection to designate Lessor's possession and ownership. While Lessor shall so take possession of the gilts following birth, Lessee shall raise all such gilt progeny to a market weight of 220 pounds and gilts selected for brood animals to a breeding weight of 270 pounds, all at the Lessee's sole expense and Lessee shall further guarantee the lives of the gilts to market and/or breeding weight.

Although the above language may be read to suggest that the lessor is entitled to two gilts per rented sow annually, both parties to this action have stipulated that the lessor was entitled to only one gilt per leased sow. Additionally, the testimony of Mr. Strong supports this lower lessor entitlement. For purposes of this opinion, we shall accept this lower entitlement as reflecting the true agreement between lessor and lessee.

each gilt weighed approximately 40 pounds. However, in accordance with the lease agreement, Four Strong, Ltd., at its own expense, was to raise the gilts to a specified weight in excess of 200 pounds. Additionally, Four Strong, Ltd., was to guarantee the lives of these gilts to this specified weight. The sow lease did not provide for the payment of cash by Four Strong, Ltd., to the Strongs, if the farm corporation was unable to provide the Strongs with the requisite number of rental gilts.

In 1982, the Strongs acquired 170 gilts from their wholly owned corporation pursuant to the terms of the sow lease. Of these 170 gilts, 50 were designated as replacements or additions to the Strongs' leased breeding herd, and the remainder were sold in 1982. The Strongs reported as ordinary income in 1982 the amounts received from the sale of the 120 marketed gilts. The replacement gilts became part of the leased breeding herd when these animals were transferred to this herd.

Under their cow lease, the Strongs were entitled annually to one calf for each eight cows leased to Four Strong, Ltd., regardless of the actual number of calves born. The calves were titled to the Strongs during the corporation's normal calf marketing season. If the corporation was unable to provide the Strongs with the requisite number of calves, the cow lease required Four Strong, Ltd., to pay the Strongs an amount of cash equal to the fair market value of the unprovided calves.[4] The cow lease did not provide that Four Strong, Ltd., was to incur further costs or bear the risk of loss from death associated with raising the calves it was eventually to transfer to the Strongs to a weight in excess of that which these calves had attained at the time the Strongs acquired legal title to the animals.

In 1982, the Strongs acquired 10 calves from Four Strong, Ltd., under the terms of the cow lease; none of these 10 calves was marketed in 1982; all 10 calves were

---

[4]In relevant part, the cow lease agreement states:

3. *Heifer/Stock Cow Rental.* Lessor shall take possession of a number of calves each year during the normal Four Strong, Ltd.'s calf marketing season, which in any event shall be prior to July 1 of each year, which number shall be equal to one-eighth (1/8) of the initial number of breeding heifers and/or stock cows set forth at Paragraph 2 hereof. In the event Lessee shall for any reason be unable to furnish Lessor the calf rental as herein provided, then Lessee shall pay to Lessor cash rent equal to the fair market value of the number and size of calves which would normally have been paid to Lessor according to the provisions of this paragraph.

replacements or additions to the Strong's leased cattle breeding herd. The calves became part of the leased breeding herd when the animals were transferred to this herd.

The Karkoshes,[5] along with the Owens, formed K & O Farms, Inc., an Iowa farm corporation which raised sows and other agricultural products. Stock ownership in K & O Farms, Inc., was divided equally between the Karkoshes and the Owens; each family group owns 50 percent of the corporation's stock. Mr. Karkosh was the president of this farm corporation in 1981. On their tax return for the calendar year 1981, Mr. Karkosh listed his occupation as a farm employee; his wife listed her occupation as a teacher's aid.

The Karkoshes transferred their livestock and other farming assets, except brood sows, to K & O Farms, Inc. Pursuant to an agreement labeled a "lease" and dated January 20, 1977, the Karkoshes then let these brood sows, in which they retained title, to K & O Farms, Inc. The leased sows, thus, represented a vehicle for the Karkoshes to draw income from the corporation.

Under the terms of the sow lease with K & O Farms, Inc., the Karkoshes and the Owens initially were to lease a total of 78 sows to the corporation. Being 50 - percent owners of the corporation, the Karkoshes were to receive one-half of the rental payments made by K & O Farms, Inc., under the lease. The lease provided that the lessee was to pay in rent annually one gilt for each sow leased, regardless of the size of the broods produced under the lessee's breeding program.[6] The gilts the Karkoshes acquired were titled to these petitioners when the gilts reached the age of 2 weeks. However, in accordance with the lease agreement, K & O Farms, Inc., at its own expense,

---

[5]Mr. Karkosh was a member of the Iowa Farm Business Association.

[6]In relevant part, this sow lease agreement states:

3. *Gilt/Sow Rental.* Lessor [referring to Gary L. Karkosh and David F. Owen jointly] shall take possession of one gilt from the first litter farrowed per rented gilt and/or sow annually. Lessor shall have as such rental the first pick of the gilts from each litter at a time when the litter is two weeks of age. The gilt rental pig so selected shall be ear-notched at the time of selection to designate Lessor's possession and ownership. While Lessor shall so take possession of the gilts following birth, Lessee shall raise all such gilt progeny to market weight of 220 pounds and gilts selected for brood animals to a breeding weight of 270 pounds, all at the Lessee's sole expense and Lessee shall further guarantee the lives of the gilts to market and/or breeding weight.

was to raise the gilts to a specified weight in excess of 200 pounds. Additionally, K & O Farms, Inc., was to guarantee the lives of these gilts to this specified weight. The sow lease did not provide for the payment of cash by K & O Farms, Inc., to the lessors, if the farm corporation was unable to provide the lessors with the requisite number of rental gilts.

In 1981, the Karkoshes acquired 23 gilts from K & O Farms, Inc., under the terms of the sow lease. Of these 23 gilts, 13 were placed into the Karkoshes' leased breeding herd and the remainder were sold in 1981. The Karkoshes reported as ordinary income in 1981 the amounts received from the sale of the 10 marketed gilts. The 13 replacement gilts became part of the Karkoshes' breeding herd when the animals were transferred to this herd.

Neither the Karkoshes nor the Strongs reported any rental income from their acquisitions under the leases of livestock which they designated as replacements or additions to their breeding herds. Petitioners instead reported income tied to these replacement animals when the animals were culled from the breeding herds and later marketed. Petitioners characterized the income recognized on the sale of these culled, breeding animals under section 1231.

## OPINION

We must decide whether petitioners were correct in not reporting any rental income from their acquisitions of livestock which they designated as replacements or additions to their breeding herds. We shall address this issue in an analytical fashion clearly delineating the steps in our inquiry.

### Did Petitioners Receive Rental Income?

Petitioners argue that they were correct in not reporting any rental income and first cite as support our decision in *Vaughan v. Commissioner*, 36 T.C. 350 (1961), affd. in part and vacated in part 333 F.2d 714 (9th Cir. 1964). In *Vaughan*, the taxpayers leased their cattle as a single operating unit to a lessee, Milford. The *Vaughan* lessors and lessee were each to receive one-half of the cash proceeds

from the lessee's sale of cattle produced from the leased herd and one-half of the surplus of cattle remaining after replacement of the leased herd.

In reaching our decision in *Vaughan,* we found that though the *Vaughan* contract "was called a 'lease agreement,' referred to the parties as 'lessors' and 'lessees,' and was generally couched in language similar to that used in rental agreements[,] * * * the agreement imposed upon [the *Vaughan* lessee] no obligation to pay any rent" and the cattle involved were not leased or hired. *Vaughan v. Commissioner,* 36 T.C. at 361. We decided that the *Vaughan* taxpayers and Milford contemplated a relationship other than that of lessor and lessee and that the agreement in *Vaughan* most nearly resembled a management contract. *Vaughan v. Commissioner,* 36 T.C. at 361. Consequently, the proceeds received by the *Vaughan* taxpayers were not ordinary income amounts arising as rentals from a lease, but instead constituted proceeds which must be taxed as amounts received from the sale of cattle. *Vaughan v. Commissioner,* 36 T.C. at 359-360.

With regard to the *Vaughan* taxpayers' receipts of one-half of the increase in the cattle herd, after replacement of the original herd, we found that the taxpayers, the owners of the cattle, had acquired an undivided, one-half interest in this increase at the calves' births. *Vaughan v. Commissioner,* 36 T.C. at 360. These taxpayers' receipts of their share of the increase in which they had always possessed substantial incidents of ownership, therefore, did not represent income realization events.[7] This finding and its consequence were premised on our examination of the property law of Idaho.[8]

The instant case is, however, distinguishable from *Vaughan.* Unlike the factual situation in *Vaughan,* we find

[7]Just as the harvesting of a crop is not a taxable event to the crop's raiser, neither is the birth of offspring a taxable event to the true, initial owner of the offspring by virtue of this owner's unrestricted rights in the dam. Cf. *Tatum v. Commissioner,* 400 F.2d 242, 246-247 (5th Cir. 1968), affg. 46 T.C. 736 (1966). No taxable events exist in these instances because the harvesting and birth do not represent realization events. Cf. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426 (1955); 1 B. Bittker & J. Eustice, Federal Taxation of Income, Estates and Gifts, par. 5.2 (1981).

[8]State law defines property rights. Federal law, however, determines the tax consequences which attend these defined rights. *Sampson v. Commissioner,* 81 T.C. 614, 618 (1983), affd. without published opinion 829 F.2d 39 (6th Cir. 1987); cf. *Burnet v. Harmel,* 287 U.S. 103, 110 (1932); *Poe v. Seaborn,* 282 U.S. 101, 110 (1930).

that petitioners and their respective farm corporations contemplated the hiring or leasing of the breeding dams and, therefore, that petitioners' acquisitions of offspring under the livestock rental agreements did represent their receipts of rent. Our findings are supported by the following factors. First, the language of the livestock agreements is clear concerning the payment of rent; and petitioners have offered no evidence suggesting that we should disregard this clear language.[9] Second, clear statements can be found in the record which indicate that petitioners retained title to and leased their brood animals as a way to draw additional income from their farm corporations. Finally, petitioners' eventual acquisitions of gilts and calves in which they did not initially possess title represented their receipts of value under the terms of the livestock agreements.[10]

### When Did Petitioners Realize Rental Income?

Having decided that the farm corporations' distribution of gilts and calves to petitioners constituted rental payments, we must determine when such payments constituted realized rental income to petitioners. Thereafter, we must decide when petitioners must recognize these realized rental income amounts.

To pinpoint the moment of rental income realization, we must discern that time at which petitioners acquired sufficient incidents of beneficial ownership in the animals they acquired. *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237-1238 (1981), a case which

---

[9]"The Commissioner is justified in determining the tax effect of transactions on the basis in which taxpayers have molded them." *Television Industries Inc. v. Commissioner,* 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959).

[10]The general rule in Iowa and other States is that the offspring of domestic animals belong to the owners of the dams. *First National Bank v. Eichmeier,* 153 Iowa 154, 133 N.W. 454, 459 (1911). However, an ancillary rule to this general proposition is that, where a dam is hired for a limited period and has increase during the term, the hirer, and not the hired dam's owner, is entitled to the increase unless provided otherwise. *Kellogg v. Lovely,* 46 Mich. 131, 8 N.W. 699, 700 (1881); *McCarty v. Blevins,* 13 Tenn. (5 Yer.) 195, 196 (1833); *Putnam v. Wyley,* 8 Johns. Cas. 432, 435; (N.Y. Sup. Ct. 1811). The Supreme Court of Iowa has cited *Kellogg v. Lovely, supra,* in its decision in *Rodgers v. Highland,* 69 Iowa 504, 29 N.W. 429, 430 (1886), and has cited *McCarty v. Blevins, supra,* in *In re Nelson's Estate,* 211 Iowa 168, 233 N.W. 115, 117 (1930), and in *In re Thompson,* 164 Iowa 20, 145 N.W. 76, 78 (1914). Furthermore, neither petitioners nor respondent have brought to our attention any Iowa cases which suggest that that State's courts do not accept this ancillary rule. As a result, we find that title to all offspring born to the leased dams in these consolidated cases rested initially and solely in the hands of the lessee-corporations. Petitioners did not acquire ownership interests in the offspring they received at these animals' births.

addressed the issue whether a bona fide arm's-length sale had occurred for Federal income tax purposes, lists a number of factors used by courts to decide whether the benefits and burdens of ownership in property have passed. In the case at hand, we have the exchanging of gilts and calves as rent for the use of leased breeding herds. In deciding when the exchange is completed and when petitioners actually acquired their rental gilts and calves for Federal tax purposes, we should consider these factors related to the shifting of beneficial ownership. Petitioners' acquisitions of mere legal title to these animals as provided by the technical requirements of State law do not, of necessity, qualify as realization events for purposes of Federal income taxation. *Yelencsics v. Commissioner,* 74 T.C. 1513, 1527 (1980); *Maher v. Commissioner,* 55 T.C. 441, 451-452 (1970), affd. in part and revd. in part 469 F.2d 225 (8th Cir. 1972); see also *Grodt & McKay Realty, Inc. v. Commissioner, supra.*

The Strongs acquired title to their gilts when these animals weighed 40 pounds. The Karkoshes acquired title to their gilts when these animals reached the age of 2 weeks. The farm corporations were, however, required to bear the expenses of raising each gilt designated as a replacement to petitioners' breeding herds to a weight of 270 pounds. Additionally, the corporations were to guarantee the lives of each gilt to this breeding weight. Because the farm corporations were responsible for the raising of the replacement gilts to 270 pounds and bore the risk of loss from death associated with the raising of these animals to this breeding weight, the corporation retained sufficient incidents of ownership in the gilts until the time the animals reached their breeding weight. In fact, in raising the gilts to 270 pounds, the corporations were preparing the animals as a final rental payment. Petitioners did not acquire sufficient incidents of beneficial ownership in their replacement gilts at the time they acquired legal title to these animals. We find instead that petitioners acquired beneficial ownership in their replacement gilts when these gilts reached 270 pounds. It was at this time that petitioners realized rental income from their acquisitions of the replacement gilts, for

this is when the gilts were distributed as rental payments for addition to the breeding herd.

The Strongs acquired title to their replacement calves during Four Strong, Ltd.'s normal calf marketing season. If Four Strong, Ltd., was unable to deliver the requisite number of calves it was obligated to provide under the cow lease, the corporation was to pay the Strongs an amount of cash equal to the fair market value of the unprovided calves. The Strongs' cow lease agreement did not, however, provide that Four Strong, Ltd., was to incur further costs or bear the risk of loss from death associated with raising the calves it was to transfer to the Strongs to a weight in excess of that which the animals had attained at the time the Strongs received legal title to these calves. Based on these facts, we consequently find that the Strongs acquired sufficient incidents of beneficial ownership in their replacement calves at the time they acquired legal title to these animals. See *Grodt & McKay Realty, Inc. v. Commissioner, supra.* It was at this point, then, that the Strongs realized rental income from their acquisition of these calves.[11]

### When Must Petitioners Recognize This Rental Income?

As above noted, our deciding the moment of rental income realization does not end our inquiry. We must determine when the income realized must be recognized for purposes of income tax reporting. Petitioners argue that their recognition of the realized income is postponed under section 1.61-4(a), Income Tax Regs.[12] In pertinent part, that regulation reads, "Crop shares (whether or not considered rent under State law) shall be included in gross income

---

[11]Having decided that petitioners have realized rental income, we note as a point of interest the tax consequences to the farm corporations resulting from our decision. First, the farm corporations would be entitled to the expenses of raising the rental animals to the weight these animals attained at the time sufficient incidents of beneficial ownership in the animals passed to petitioners. Second, the farm corporations would recognize a gain on the transferring of beneficial ownership in the rental animals to petitioners. This gain is a consequence of the corporations' satisfying their rental obligations with a payment of appreciated property. *United States v. Davis,* 370 U.S. 65 (1962); J. Freeland, S. Lind & R. Stephens, Fundamentals of Federal Income Taxation 252 (5th ed. 1985). Finally, because the corporations are paying rent, rental expense deductions are in order.

[12]Sec. 1.61-4(a), Income Tax Regs., can be traced to a 1918 forbear. In defining gross farm income, T.D. 2690, Regs. 33, art. 4, par. 31 (1918), provided that, "Rents received in crop shares shall likewise be returned as of the year in which the crop shares are reduced to money or a money equivalent."

as of the year in which the crop shares are reduced to money or the equivalent of money."[13]

[The regulation] accords to sharecrop landlords the privilege of waiting until the crop shares are reduced to money before recognizing the income. This accounting procedure is a rule of administrative convenience, made necessary by the absence of cash with which to pay the tax prior to a sale and by difficulties in abstract valuation of farm products. * * * [*Tatum v. Commissioner*, 400 F.2d 242, 247 (5th Cir. 1968), affg. 46 T.C. 736 (1966).]

Noting the regulation's purpose, we must decide whether petitioners' transfers of the replacement gilts and calves to their leased breeding herds represent reductions of these replacement animals to "money or the equivalent of money." Under the present factual situations, there have obviously been no reductions to money. Our focus is, therefore, limited to a discussion of the factual issue of what constitutes a reduction to a "money equivalent" within the context of the regulation.[14]

---

[13]Accrual basis taxpayers may also take advantage of the postponement of income recognition on crop shares. See sec. 1.61-4(b), Income Tax Regs.

Additionally, rents received in the form of livestock have qualified under the crop-share recognition rule. See Rev. Rul. 64-289, 1964-2 C.B. 173, 174; cf. *Tatum v. Commissioner*, 46 T.C. 736, 741 (1966), affd. 400 F.2d 242 (5th Cir. 1968).

Finally, through their employment, managerial positions, and stock ownership, petitioners have participated heavily in the operation and management of their closely held farm corporations. These actions qualify petitioners as being engaged in the business of farming (see secs. 1.61-4(d) and 1.175-3, Income Tax Regs.), and, consequently, permit petitioners to take advantage of the crop-share recognition rule of sec. 1.61-4(a), Income Tax Regs. See *Estate of Davison v. United States,* 155 Ct. Cl. 290, 301, 292 F.2d 937, 942 (1961). In reaching this decision, we have looked at the actions of husband and wife together.

In deciding that petitioners may take advantage of the crop-share recognition rule, we, nonetheless, caution that:

"It is true that for many purposes the Code and regulations provide that sharecrop landlords are to be treated as farmers and the crop shares they receive as rents are to be treated as farmers' harvested crops. * * * However, the analogy between farmers and sharecrop landlords is not complete and we think the receipt of the crop shares * * * result[s] in the receipt of rental income * * * and [does] not represent unrealized appreciation in the value of property. [*Tatum v. Commissioner,* 46 T.C. at 739; fn. refs. omitted.]"

In receiving livestock shares, petitioners act in the capacity of landlords. They are not operating farmers receiving the benefits of their own handiwork. The livestock shares petitioners receive represent "payment[s] by the tenant[s] for the use of the [dams] [and] are rental income assets no less than money paid for the same purpose." *Tatum v. Commissioner,* 400 F.2d at 247.

[14]In discerning the meaning of a particular phrase, we have often examined the meaning of that given to analogous wording. Cf. *Goldstein v. Commissioner,* 89 T.C 535, 544 (1987); *Retired Teachers Legal Defense Fund, Inc. v. Commissioner,* 78 T.C. 280, 287 (1982). In this case, we find it helpful to examine the meaning of the phrase "cash equivalent" in our attempts to define "money equivalent." We first point out that whether an item represents "cash and its equivalent" is a question of fact. *Moss American, Inc. v. Commissioner,* T.C.

Citing situation (2) in Rev. Rul. 75-11,[15] 1975-1 C.B. 27, respondent argues that when petitioners place the livestock shares in their leased breeding herds, the shares have been reduced to money equivalents.[16] He opines that because petitioners have not had to purchase replacement animals, but instead have relied on their acquired gilts and calves to restock their brood herds, petitioners have successfully defrayed the cost of procuring replacement animals from other sources. This defraying of costs, respondent suggests, is a "money equivalent."

In reply, petitioners argue that their transfers of the acquired gilts and calves to the breeding herds were not "dispositions" resulting in income recognition. Additionally, they note that the taxpayers in the ruling cited by respondent received deductions, either under section 170 or section 162, equal in amount to the income these taxpayers recognized.

Petitioners' transfers of the acquired gilts and calves to their leased breeding herds represent transfers of the animals to commercial applications from which further rental income will be realized. These transfers represent dispositions of the animals through these animals' dedication to productive use in petitioners' breeding herds. In making the transfers, petitioners have not had to expend money to purchase breeding animals from outside sources. This money savings is then in the "nature of money"[17] for,

---

Memo. 1974-252. Similarly then, we must look to the facts and circumstances of the case before us to decide whether a "money equivalent" exists.

[15]Rev. Rul. 75-11, 1975-1 C.B. 27, modifies Rev. Rul. 56-496, 1956-2 C.B. 17. In modifying Rev. Rul. 56-496, the Service offered its justification in G.C.M. 35374 and G.C.M. 34076.

We have noted Rev. Rul. 56-496 but have not passed on its statement of the law. *Parmer v. Commissioner,* T.C. Memo. 1971-320, affd. 468 F.2d 705 (10th Cir. 1972).

[16]In mentioning Rev. Rul. 75-11, *supra,* we note that taxpayers and personnel of the Internal Revenue Service may rely on a revenue ruling only if the facts and circumstances of the situation for which the ruling is to serve as precedent are substantially the same as those facts and circumstances found in the ruling. Rev. Proc. 88-1, 1988-1 I.R.B. 7, 9. More significantly, a revenue ruling "is simply the contention of one of the parties to the litigation, and is entitled to no greater weight." *Estate of Lang v. Commissioner,* 64 T.C. 404, 406-407 (1975), affd. in part and revd. in part 613 F.2d 770 (9th Cir. 1980). Where, however, a ruling represents a reasonable interpretation of a statute or regulation, we have looked to it. See *Martin v. Commissioner,* 56 T.C. 1294, 1299 (1971); *Fratantonio v. Commissioner,* T.C. Memo. 1988-158; cf. *Stubbs, Overbeck & Associates v. United States,* 445 F.2d 1142, 1147 (5th Cir. 1971).

[17]A comparable phrase, "cash equivalent," has been defined as an item which is in the "nature of money." *R.M. Smith, Inc. v. Commissioner,* 69 T.C. 317, 329 (1977), affd. 591 F.2d 248 (3d Cir. 1979).

in a broad economic sense, petitioners now have at their disposal funds which have not had to be directed toward the purchase of brood replacements. Accepting such, we hold that petitioners have received a "money equivalent" and must accordingly recognize income. That is, we find that at the time of the transfers in question the rental income potential reflected in the transferred gilts and calves has been fully achieved and, therefore, is recognizable and taxable. See *Estate of Davison v. United States,* 155 Ct. Cl. 290, 302, 292 F.2d 937, 943 (1961). In this respect, petitioners' crop-share rental arrangements with their corporations provided continuing and perpetual breeding herds. When animals were culled and sold, their number was replaced. This allowed petitioners to sell culls and maintain the breeding herd without any cost, due to the lease arrangement which provided the replacements as rent. It has long been established that income is realized when rent, dividends, or other entitlements are paid in form other than cash.[18] Sec. 61(a); sec. 1.61-1(a), Income Tax Regs.

In requiring petitioners to recognize income, we are guided by the decision of the 5th Circuit U.S. Court of Appeals in *Tatum v. Commissioner, supra,* and of the 10th Circuit U.S. Court of Appeals in *Parmer v. Commissioner,* 468 F.2d 705 (10th Cir. 1972), affg. a Memorandum Opinion of this Court. Each of these appellate courts has stressed that a crucial distinction exists between crops and livestock produced by the labor of a farmer and crops and livestock received by a landlord in the form of rent. Crops and livestock produced by a farmer are income-producing properties; crops and livestock received by a landlord in the form of crop-share rentals are income assets taxable when reduced to money or a money equivalent. *Tatum v. Commissioner,* 400 F.2d at 246-248; *Parmer v. Commissioner,* 468 F.2d at 707. A consequence of this distinction is that the income reflected in the crop-share rentals must be recognized when the taxpayer's relationship to these income assets is altered through the assets' transfer by sale, gift,

---

[18]"Rent, whether paid in cash or in kind, during the lease or upon termination of the lease, is income to the recipient." *Smith v. Commissioner,* T.C. Memo. 1974-195.

or otherwise.[19] See *Tatum v Commissioner, supra; Parmer v. Commissioner, supra; Estate of Davison v. United States, supra.*

We place little stock in petitioners' argument that they should not be required to recognize rental income on the livestock transfers because they do not receive in the year of the transfers counterbalancing deductions equal in amount to the income they must recognize. That the taxpayers in Rev. Rul. 75-11, and those in *Tatum* and *Parmer*, received counterbalancing deductions is a mere fortuity of the factual patterns existent in the presented situations.[20] Furthermore, on their recognition of income, petitioners acquire a tax cost basis in the replacement animals (cf. sec. 1.61-2(d)(2), Income Tax Regs.), from which they can subtract depreciation deductions over time. See sec. 167(a); sec. 1.61-4(a), Income Tax Regs. The application of the gilts and calves to the breeding herds represents an addition to the capital of petitioners' breeding herd. See secs. 1016(a) and 1231(b)(3) and sec. 1.61-4(a), Income Tax Regs. Being capitalized, the animals are amortizable and deductible under the Code and regulation sections mentioned in the preceding sentence.[21]

---

[19]In *Estate of Davison v. United States,* 155 Ct. Cl. 290, 301, 292 F.2d 937, 942 (1961), the Court of Claims suggests "that only an actual sale of the [crop share] is a reduction to money or its equivalent as the regulations describe." Though we have cited *Estate of Davison* in the past and do so in this opinion, we have not, and do not, cite the case for this suggestion.

Furthermore, in reaching this suggestion in *Estate of Davison,* the Court of Claims cited our opinion in *SoRelle v. Commissioner,* 22 T.C. 459 (1954). In *SoRelle,* however, we were not faced with a reduction of a crop share to a money equivalent.

[20]That the taxpayer in situation (1) of Rev. Rul. 75-11 received a charitable deduction was premised solely on this taxpayer's decision to donate the crop shares to an organization properly described in sec. 170(c). That the taxpayer in situation (2) of the ruling received an ordinary and necessary trade or business deduction associated with his use of the crop shares reflected the fact that this taxpayer's crop shares represented expense account, and not capital account, items.

As a point of interest, we also note that none of the taxpayers in *Tatum, Parmer,* or Rev. Rul. 75-11 ever received any money from an actual sale of the sharecrop items.

[21]We have decided that petitioners must recognize income on the transfer of the replacement gilts to the breeding herds. At this point we find it of equal interest to examine the tax consequences attendant to petitioners' receipts of gilts which they later marketed. Like the replacement gilts, the marketed gilts represented rental animals. Petitioners realized rental income tied to these marketed animals when the animals reached 220 pounds. Nevertheless, the marketed gilts represented crop-share items; therefore, the recognition of the realized rental income reflected in these marketed gilts was postponed until the time these animals were reduced to money or a money equivalent. When the marketed animals were sold, these animals were reduced to money; and, consequently, the rental income reflected in them should be recognized.

## What Is the Proper Amount of Rental Income That Petitioners Must Recognize?

Having decided that petitioners must recognize the rental income reflected in the replacement gilts and calves on the transfer of these animals, we must determine the amount of this recognized income. In the notice of deficiency sent to the Strongs, respondent required these petitioners to recognize an income amount equal to the value of the replacement gilts and calves these petitioners acquired at the time title to these animals passed. Additionally, respondent did not reduce this recognized income amount by a proper amount of depreciation. In the notice of deficiency sent to the Karkoshes, respondent required these petitioners to recognize an income amount equal to the value of the replacement gilts these petitioners acquired at the time these replacement animals reached their breeding weight of 270 pounds. In valuing the gilts at this breeding weight, respondent was attempting to reflect as rental income the additional financial benefit the Karkoshes received from K & O Farms, Inc.'s having to raise, at its own expense, the gilts to 270 pounds. K & O Farms, Inc., incurred these raising expenses prior to its leasing the replacement animals. Additionally, respondent reduced the income amount he required the Karkoshes to recognize by a proper amount of depreciation.

In determining the amount of recognized income reflected in the replacement animals in both of these consolidated cases, our final decision is made with an eye toward the value of these animals at the time of income realization. We find that the method employed by respondent in the Karkosh instance more accurately reflects the true rental value each set of petitioners received under their respective sow lease agreements.[22] Under the Strong's cow lease agreement, Four Strong, Ltd., is not required to take on additional responsibilities tied to its raising the calf replacements to a specified weight in excess of that weight the calves had attained at the time the Strongs gained title to

---

[22] In his opening brief, respondent notes his dichotomous treatment of the petitioners in these consolidated cases. He, however, states that he will not claim as an additional deficiency in the Strong case an amount equal to the additional rental value associated with Four Strong, Ltd.'s raising of the replacement gilts to the breeding weight of 270 pounds.

these animals. As a result, the method employed by respondent in valuing these calf replacements is correct.

Petitioners have the burden of proving that those amounts appearing in their notices of deficiency are incorrect. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a). Though petitioners criticize respondent's valuation figures, they have not come forward with evidence which sufficiently places these figures in doubt.[23] Consequently, respondent's rental income figures are sustained.

In conclusion, we would observe that we are required by stare decisis to resolve the issue before us under longstanding principles of income realization and recognition. See *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955); *Helvering v. Bruun*, 309 U.S. 461 (1940); 1 B. Bittker & J. Eustice, Federal Taxation of Income, Estates and Gifts, par. 5.2 (1981). We also note that petitioners structured their farming operations as they saw fit. They must, therefore, accept the tax consequences which flow from their chosen structures and may not now claim that alternative structures would have resulted in their having to pay no tax. *Television Industries, Inc. v. Commissioner*, 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959); *Parmer v. Commissioner*, T.C. Memo. 1971-320, affd. 468 F.2d 705 (10th Cir. 1972).

To reflect the foregoing,

> *Decision will be entered under Rule 155 in docket No. 34393-84.*[24]
>
> *Decision will be entered for the respondent in docket No. 34544-84.*

---

[23]As earlier mentioned, one of the purposes behind the delayed crop-share recognition rule of sec. 1.61-4(a), Income Tax Regs., is to mitigate the difficulties tied to the abstract valuation of farm products. In this instance, respondent has produced certified copies of USDA reports which give detailed monthly quotations for the value of livestock sold in the Iowa, southern Minnesota direct cattle and hog markets in 1981 and 1982. In the absence of evidence to the contrary, such monthly quotations represent concrete statements of value and may serve as starting points for valuing the livestock in question.

Petitioners objected to the introduction of the certified copies as evidence. We, however, find that the copies are properly authenticated copies of relevant *public records,* and, as such, are admissible. See Fed. R. Evid. 401, 402, 803(8) and 902(4).

[24]A Rule 155 computation is required in docket No. 34393-84 to grant petitioners in that case a proper depreciation deduction based on the amount of income respondent determined the Strongs must recognize in the notice of deficiency sent to these petitioners. See note 22, *supra.*