ROGER P. AND MARCIA DUDDEN, PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 8463-84.        Filed September 14, 1988.

*Larry E. McKibben* and *James L. Goodman,* for the petitioners.

*Vincent E. Mauer,* for the respondent.

HAMBLEN, *Judge:* For petitioners' taxable years ended December 31, 1980, and December 31, 1981, respondent determined respective deficiencies in petitioners' Federal income taxes of $3,743 and $1,871. After concessions,[1] the primary issue for determination is whether petitioners were correct in not reporting any rental income from their acquisition of livestock which they designated as replacements or additions to their breeding herds.

FINDINGS OF FACT

Some of the facts are stipulated and found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners Roger P. and Marcia Dudden are husband and wife and resided at Rural Route Reinbeck, Iowa, at the time they filed their petition. They timely filed their joint Federal

---

[1]Respondent increased petitioners' interest income by $200 in 1981. In explaining the increase in the notice of deficiency sent to petitioners, respondent stated, "The $400.00 exclusion of dividends and interest you claimed on your 1981 return is reduced by $200.00 because none of the interest income you received in 1981 is eligible for the exclusion under Section 116 of the Internal Revenue Code. Accordingly, taxable income is increased $200.00." Petitioners concede that this adjustment to their 1981 income is correct.

Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

income tax returns for the taxable years 1980 and 1981 and used the cash basis method of accounting. On these 1980 and 1981 returns, Mr. Dudden listed his occupation as a farmer; his wife described herself as a housewife.

The Duddens each own 50 percent of the outstanding shares of Dudden Farms, Inc., an Iowa farm corporation engaged in the raising of hogs, corn, and soybeans and incorporated in April of 1976. During the years in issue, Mr. Dudden was the president of Dudden Farms, Inc.; his wife served in the capacity of the farm corporation's secretary.

Petitioners had decided to incorporate their farm operation as a way to obtain fringe benefits available to corporations and to make it easier to bring their children into the operation in the future. Upon incorporating Dudden Farms, Inc., the Duddens transferred to the corporation 480 acres of land, farm machinery, and an indebtedness associated with the land. Additionally, Dudden Farms, Inc., held all the facilities necessary for a farrow to finish hog operation and owned boars used for breeding purposes. The couple retained title to brood sows and gilts which they later let to Dudden Farms, Inc., under an agreement labeled a "lease" and dated July 1, 1976.[2] Petitioners also continued to farm 160 acres of rented land.

The Dudden's sow lease initially covered the 180 sows comprising the couple's breeding herd. Under the lease's terms, the lessee-corporation was to retain possession of this leased herd through the animals' fourth farrowing. At the end of this farrowing, the corporation was to return the leased sows to the Duddens for marketing. If the health of an animal required its sale prior to its fourth farrowing, the animal was returned to the Duddens. For each sow returned to the Duddens, or for each sow which died while in the lessee's possession, the Duddens were to receive a 220-pound gilt as a replacement.[3]

---

[2] The agreement between Dudden Farms, Inc., and petitioners defined these parties' relationship thusly, "in no event shall the relationship between [Dudden Farms, Inc.] and Lessor be considered a joint venture, partnership or any other relationship other than Lessor and Lessee."

[3] In relevant part, the sow lease agreement states:

4. For each sow returned to Lessor as above provided, or which dies while in the possession of the Lessee, one (1) two hundred twenty pound gilt shall be selected and conveyed to lessor as a replacement for such sow and shall be the consideration to Lessor for this Agreement.

Duddens Farms, Inc., was entitled to all pigs farrowed in its breeding operation with the exception of those gilts which were designated as replacements to the Dudden's breeding herd. These replacement gilts remained the property of petitioners.[4] Dudden Farms, Inc., however, was obligated, at its own expense, to feed and care for petitioners' gilts to a weight of 220 pounds.

In 1980, 118 sows were culled from the leased breeding herd and returned to petitioners. In 1981, 109 culled sows were returned to petitioners. Pursuant to the terms of the lease, petitioners acquired 118 replacement gilts in 1980 and 109 such gilts in 1981. Roger Dudden selected and tagged these replacement gilts when the animals weighed 220 pounds. The Duddens did not receive any cash under the sow agreement from Dudden Farms, Inc.

Petitioners held their replacement gilts for approximately 3 weeks after the animals' initial selection. During this 3-week period, petitioners prepared the gilts for breeding purposes. At the end of this time period, all replacement gilts were placed in petitioners' breeding herd and let to Dudden Farms, Inc., under the terms of the July 1, 1976, sow lease agreement.

Petitioners reported no rental income from their receipt under the lease of replacement gilts weighing 220 pounds. They instead reported income tied to replacement breeding animals when the animals were culled from the breeding herds and later marketed. Petitioners characterized all the income from the sale of the culled animals under section 1231.[5] For example, in the years 1980 and 1981, petitioners

---

[4]The sow lease agreement pertinently provides:

2. The corporation shall be entitled to the possession of the sows and gilts so leased and delivered for breeding and farrowing purposes and shall be entitled to the progeny therefrom, except as otherwise provided by this agreement.

\*     \*     \*     \*     \*     \*     \*

4. For each sow returned to Lessor as above provided, or which dies while in the possession of the Lessee, one (1) two hundred twenty pound gilt shall be selected and conveyed to lessor as a replacement for such sow and shall be the consideration to Lessor for this Agreement.

\*     \*     \*     \*     \*     \*     \*

6. Lessor shall at all times remain the sole owner of the animals leased hereunder.

\*     \*     \*     \*     \*     \*     \*

The replacement gilts were not selected and tagged for identification at these animals' births.

[5]Respondent determined no deficiencies related to the amount and character of these reported gains.

recognized long-term capital gains in the respective amounts of $18,301 and $19,052 from their sale of culled breeding sows.[6]

The U.S. Department of Agriculture (USDA) prepares market quotation reports for hogs sold in selected Iowa and Southern Minnesota hog markets. The quotations are broken down by animal weight and grade and reflect monthly and yearend average prices received per 100 pounds of animal weight. In 1980, the USDA's market report was based on hog auctions in Algona, Carroll, Gowrie, Kalona, Knoxville, and Story City, Iowa. In 1981, the report was based on auctions in these same six Iowa cities and in Dunlap, Iowa.

## OPINION

This case parallels *Strong v. Commissioner*, 91 T.C. 627 (1988), decided this date. In *Strong*, taxpayers acquired cows and gilts under livestock lease agreements entered into between these taxpayers and their closely held farm corporations. We decided that the sow agreements were leases, that taxpayers realized rental income under these leases, that taxpayers could take advantage of the crop share recognition rule found in section 1.61-4(a), Income Tax Regs., and that taxpayers recognized an income amount when they transferred their acquired replacement animals to their leased breeding herds.

Petitioners argue that they were correct in not reporting any rental income under their lease agreement with Dudden Farms, Inc., and cite *Vaughan v. Commissioner*, 36 T.C. 350 (1961), affd. in part and vacated in part 333 F.2d 714 (9th Cir. 1964), in support of their position. *Vaughan* is, however, inapposite. Petitioners and their closely held farm corporation provided in their livestock agreement that "in no event shall (their) relationship * * * be considered * * * any other relationship other than Lessor and Lessee." Moreover, the language of their agreement is emphatic

---

[6]Petitioners reported their sow sales on their Schedules D for 1980 and 1981 as follows:

| Date sold | Gross sales price | Cost of other basis | Gain |
|---|---|---|---|
| 1980 | $18,301 | Raised | $18,301 |
| 1981 | 19,052 | 0 | 19,052 |

in its statement that, in return for the use of petitioners' breeding herd, Dudden Farms, Inc., was to convey "consideration" to petitioners. Petitioners have offered no evidence suggesting that we should disregard these contractual statements. We, consequently, are justified in determining the tax effect of this transaction on the basis in which petitioners have freely molded it. *Strong v. Commissioner,* 91 T.C. 627 (1988); *Television Industries, Inc. v. Commissioner,* 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959); *Parmer v. Commissioner,* T.C. Memo. 1971-320, affd. 468 F.2d 705 (10th Cir. 1972). Petitioners and their farm corporation have structured in both form and substance a lessor-lessee relationship, and we accept this relationship.

We now focus on petitioner's realization of rental income. After determining the moment of realization, we then consider the time petitioners must recognize their rental income for Federal tax purposes.

To pinpoint the moment of rental income realization, we must discern that time at which petitioners acquired sufficient incidents of beneficial ownership in the animals they acquired. *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237-1238 (1981), a case which addressed the issue whether a bona fide arm's-length sale had occurred for Federal income tax purposes, lists a number of factors used by courts to decide whether the benefits and burdens of ownership in property have passed. In the case at hand, we have the exchanging of gilts as rent for the use of a leased breeding herd. In deciding when the exchange is completed and when petitioners actually acquired their rental gilts for Federal tax purposes, we should consider these factors related to the shifting of beneficial ownership. Petitioners' acquisitions of mere legal title to these animals as provided by the technical requirements of State law do not, of necessity, qualify as significant events for purposes of Federal income taxation. *Strong v. Commissioner,* 91 T.C. at 635; *Yelencsics v. Commissioner,* 74 T.C. 1513, 1527 (1980); *Maher v. Commissioner,* 55 T.C. 441, 451-452 (1970), affd. in part and revd. in part 469 F.2d 225 (8th Cir. 1972); see also *Grodt & McKay Realty, Inc. v. Commissioner, supra.*

The agreed-to stipulations establish that petitioners at all times had legal title in the replacement gilts which they acquired under the sow lease agreement at issue in this case.[7] Dudden Farms, Inc., nevertheless, was required, at its own expense, to feed and care for these gilts that were not yet part of the breeding herd it leased and whose legal title was in petitioners' hands. The farm corporation was responsible for the well-being and upkeep of these particular gilts until the time these animals reached the weight of 220 pounds and were thereafter placed in petitioners' care. Petitioners then finished the preparation of the animals for breeding purposes.

In great part, these facts closely resemble those in *Strong*. As a result, we find that though legal title to the replacement gilts rested initially in the hands of petitioners, the true owner of the newborn gilts for Federal tax purposes was Dudden Farms, Inc. This corporation was the entity which truly possessed sufficient incidents of beneficial ownership in these animals at their births. The farm corporation held these incidents of ownership until the replacement animals reached the weight of 220 pounds and were delivered to petitioners for final preparation to join the leased breeding herd. In raising the gilts to 220 pounds, Dudden Farms, Inc., was preparing the animals as a final rental payment. Petitioners' subsequent acquisitions of 220-pound gilts were the events which triggered petitioners' acquisitions of beneficial ownership in the animals. It was

[7]State law defines property rights. Federal law, however, determines the tax consequences which attend these defined rights. *Sampson v. Commissioner*, 81 T.C. 614, 618 (1983), affd. 829 F.2d 39 (6th Cir. 1987); cf. *Poe v. Seaborn*, 282 U.S. 101, 110 (1930); *Burnet v. Harmel*, 287 U.S. 103, 110 (1932).

The general rule in Iowa and other States is that the offspring of domestic animals belong to the owner of the dams. *First National Bank v. Eichmeier*, 153 Iowa 154, 133 N.W. 454, 459 (1911). However, an ancillary rule to this general proposition is that, where a dam is hired for a limited period and has increase during the term, the hirer, and not the hired dam's owner, is entitled to the increase unless provided otherwise. *Kellogg v. Lovely*, 46 Mich. 131, 8 N.W. 699, 700 (1881); *McCarty v. Blevins*, 13 Tenn. (5 Yer.) 195, 196 (1833); *Putnam v. Wyley*, 8 Johns. Cas. 432, 435 (N.Y. Sup. Ct. 1811). The Supreme Court of Iowa has cited *Kellogg v. Lovely, supra,* in its decision in *Rodgers v. Highland,* 69 Iowa 504, 29 N.W. 429, 430 (1886), and has cited *McCarty v. Blevins, supra,* in *In re Nelson's Estate,* 211 Iowa 168, 233 N.W. 115, 117 (1930), and in *In re Thompson,* 164 Iowa 20, 145 N.W. 76, 78 (1914). Furthermore, neither petitioners nor respondent has brought to our attention any Iowa cases which suggest that that State's courts do not accept this ancillary rule. As a result, we find that, since the stipulation of facts established that petitioners had provided for their initial title to replacement gilts born to their leased dams, title to these gilts did indeed vest in petitioners at these gilts' births.

at these times that petitioners realized rental income from their acquisitions of the replacement animals, for these were when the gilts were distributed as rental payments for addition to the breeding herd.

As above noted, our deciding the moment of rental income realization does not end our inquiry. We must determine when the realized income must be recognized for purposes of income tax reporting. Petitioners' acquisitions of 220-pound gilts represent their receipts of "crop share" amounts. See *Strong v. Commissioner*, 91 T.C. at 636 n. 13. Moreover, petitioners' employment, managerial positions, and stock ownership qualify petitioners as being engaged in the business of farming (see secs. 1.61-4(d) and 1.175-3, Income Tax Regs.), and, consequently, permit petitioners to take advantage of the crop share recognition rule of section 1.61-4(a), Income Tax Regs.[8] See *Strong v. Commissioner*, 91 T.C. at 636 n. 13; *Estate of Davison v. United States*, 155 Ct. Cl. 290, 301, 292 F.2d 937, 942 (1961). However, in establishing that petitioners are able to take advantage of the crop share recognition rule, we point out that petitioners are acting in the capacity of landlords when they receive their livestock shares. The shares represent "payment[s] by [a] tenant for the use of the [dams] [and] are rental income assets no less than money paid for the same purpose." *Tatum v. Commissioner*, 400 F.2d 242, 247 (5th Cir. 1968), affg. 46 T.C. 736 (1966).

Following *Strong*, we hold that petitioners' transfer of the replacement gilts to their leased breeding herd represents a reduction of the crop share amounts reflected in these animals to a "money equivalent" within the meaning of the crop share recognition rule. *Strong v. Commissioner*, 91 T.C. at 638. In this respect, petitioners' crop share rental arrangement with their corporation provided a continuing and perpetual breeding herd. When sows were culled and sold, their exact number replaced them. This allowed petitioners to sell culls and maintain the breeding herd without any cost, due to the lease arrangement which provided the replacements as rent. It has long been

---

[8]In pertinent part, sec. 1.61-4(a), Income Tax Regs., reads "Crop shares (whether or not considered rent under State law) shall be included in gross income as of the year in which the crop shares are reduced to money or the equivalent of money."

established that income is realized when rent, dividends, or other entitlements are paid in form other than cash.[9] Sec. 61(a); sec. 1.61-1(a), Income Tax Regs. This reduction of the crop share amount to a money equivalent results in the amount's recognition and taxability.

In determining the amount of rental income that petitioners must recognize, we look to the USDA market quotation reports. Petitioner objected to the introduction of these reports on the grounds that the reports represented hearsay evidence and were irrelevant. Focusing on the hearsay objection, we find that the reports fall under the hearsay exception for public records and reports. See Fed. R. Evid. 803(8); see also E.J. Imwinkelreid, Evidentiary Foundations 173 (1980). Focusing on petitioners' relevancy objection, we note that, though petitioners did not deal in any of the particular markets listed in the USDA market reports, the actual auction locations on which the price reports were based represent locations scattered throughout the entirety of Iowa and, therefore, are representative of that State's livestock selling markets. Being based on such a representative sample, the USDA market quotation reports are relevant. Petitioners have not suggested that the hog prices in markets in which they actually dealt were substantially different from those prices in the USDA surveys. Petitioners bear the burden of proof in this instance (*Welch v. Helvering,* 290 U.S. 111, 115 (1933); Rule 142(a)), and they have produced no evidence which would circumscribe our use of the USDA price reports.

Moving on, respondent would have us look to the market value of a 270-pound gilt in our determining the rental income amount reflected in each of petitioners' replacement gilts. We, however, find that respondent's reference to a 270-pound gilt is not supported by the facts in this case. No reference in the record has been made to a 270-pound figure. Additionally, the stipulated evidence in this case is unequivocal in its statement that after Robert Dudden selected the 220-pound replacement gilts, the gilts were transferred to petitioners for final preparation of the animals to join the leased breeding herd. Petitioners were, therefore, responsible

---

[9]"Rent, whether paid in cash or in kind, during the lease or upon termination of the lease, is income to the recipient." *Smith v. Commissioner,* T.C. Memo. 1974-195.

for these animals after the animals had each attained a 220-pound weight. Respondent's statement in his opening brief that "There is no evidence in the record to demonstrate that the petitioners and not the corporation cared for the replacement animals while they gained these 50 pounds" is obviously in direct contradiction to the facts as stipulated. We find then that petitioners must recognize a rental income amount based on the market value of a 220-pound gilt on the date petitioners acquired substantial incidents of ownership in their animals. [10] Based on the USDA reports, we find that in 1980 petitioners received rental income in the amount of $10,296.[11] In 1981, we find that petitioners received $10,533 in rental income.[12] Petitioners are entitled to depreciation amounts based on these sums. See sec. 1.61-4(a), Income Tax Regs.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[10]Though the replacement gilts may well have weighed 270 pounds at the time they were transferred to petitioners' leased breeding herd and petitioners were required to recognize rental income, we note that this weight should not be used in determining petitioners' recognized rental income. Using the 270-pound figure, we might well determine an income amount which is either higher or lower than that income amount based on a 220-pound weight. Sec. 1.61-4(a), Income Tax Regs., however, acts only as a timing mechanism for purposes of recognizing income which has already been realized. This regulation section does not limit the amount of realized income petitioners must recognize. See secs. 1245(b)(3), 1250(d)(3) and 351(b).

[11]Not knowing the date in 1980 when petitioners acquired substantial incidents of ownership in their 220-pound gilts, we have decided to look to the average yearly price paid per hundred-pound weight for such gilts. Two hundred- to 230-pound gilts classified as U.S. 1-2 fetched a 1980 average yearly price of $39.76 per 100 pounds. This $39.76 price results in rental income to petitioners of $10,322 ($39.76 × 2.2 × 118). Two hundred- to 230-pound gilts classified as U.S. 2 were priced at a 1980 yearly average of $39.56 per 100-pound weight. This $39.56 price results in realized rental income to petitioners of $10,270 ($39.56 × 2.2 × 118). The average of these two 1980 rental income amounts is $10,296. We have chosen this rental income average because we do not know the classification of petitioners' replacement gilts.

[12]For 200- to 230-pound gilts, U.S. 1-2, the average yearly price per 100-pound weight was $44.07 in 1981. Rental income using this average price equals $10,568 ($44.07 × 2.2 × 109). For 200- to 230-pound gilts, U.S. 2, the average yearly price per 100-pound weight was $43.78 in 1981. Rental income using this latter price equals $10,498 ($43.78 × 2.2 × 109). The average rental income amount based on these two income figures is $10,533. We use this rental income average because we do not know the classification of petitioners' replacement gilts.