CALVIN P. APPLEGATE AND IRMA APPLEGATE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12721-88.     Filed May 16, 1990.

---

*Ronald K. Fellheimer,* for the petitioners.*
*Michael W. Bitner,* for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1984 in the amount of $240,955. After concessions, the issues for decision are whether the sales of grain received pursuant to crop share leases qualified for reporting on the installment method under section 453[1] and whether the payments received at the time of execution of the contracts for such sales of grain constitute ordinary income or capital gain.

All of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioners maintained their legal residence in Streator, Illinois, at the time of the filing of their petition herein. Petitioners timely filed their joint Federal income tax return for 1984 on the cash basis with the Internal Revenue Service Center, Kansas City, Missouri.

Petitioners owned farmland located in Livingston and LaSalle Counties, Illinois. During 1984, as well as during prior years, petitioner Calvin P. Applegate acted as a materially participating landlord with respect to the farmland. The actual physical farm labor was provided by six tenant farmers pursuant to material participation farm leases (leases) between petitioner Calvin P. Applegate as lessor and the respective tenant farmers as lessees. Under the terms of the leases, petitioners received one-half of all corn, soybeans, and small grains produced on petitioners'

---

*Brief amicus curiae was filed by Richard L. Bacon and William F. Cooney as attorneys for the Illinois Agricultural Association.

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

farmland, as well as paying the customary landlord's share of farm expenses.

During 1979 through 1983, petitioners sold a portion of the crop shares received by them pursuant to the leases, and the remainder was stored with local grain elevators. As of January 1, 1984, petitioners held documents from three local grain elevators evidencing their ownership from the 1979 through 1983, crop shares of 59,781.74 bushels of soybeans, and 12,382.63 bushels of corn. During 1983, petitioners paid storage costs of $41,847 with respect to this grain.

During 1984, petitioner Calvin P. Applegate entered into "price later contracts" (contracts) with the grain elevators for the sale of the stored grains. A contract with Blackstone-Sunbury-Nevada Grain Co., Inc., which is representative of all the price later contracts, provided:

Seller as identified below agrees that Buyer does hereby purchase from Seller and Seller does hereby sell to Buyer 5343.57 bushels of #2 Yel. Soybeans subject to market discounts applicable to Buyer at time of (cross out one): (delivery/pricing) under following terms and conditions:

1. The fixing of the price of the Grain is deferred, and may be established by Seller at any time, but not later than May 14, 1985, and upon demand by the Seller, the Buyer is obligated to pay his regular bid price upon the date of demand for the commodities being priced by the Seller. If no such notice is given by the Seller, by the date established in the preceding sentence, the Buyer's offered price on that date shall control, and Buyer shall promptly give Seller written notice of that price, unless a renewal has been written prior to the above expiration date covering the same Grain covered by this contract and agreed to by both Buyer and Seller. The following statements are made a part of this agreement pursuant to applicable regulations:

(a) Title to the Grain described in this contract passed to Buyer upon delivery of the Grain to him.

(b) The duration of this contract shall not exceed 12 months from the date delivery is completed.

(c) The buyer is required to maintain liquid assets equal to ninety per cent of price later obligations by Illinois law.

2. Buyer may deduct from the purchase price applicable charges on grain ticket or the specific following charges:

Deferment Charge: (specify) $7106.94 Premium Ck # 7510

Other Charges: (specify) [None]

3. THE GRAIN COVERED BY THIS CONTRACT IS SOLD, (NOT STORAGE) AND AS SUCH IS COVERED BY A GRAIN DEALER'S BOND FOR A PERIOD OF 160 DAYS FROM THE DATE OF DELIVERY OR PRICING, WHICHEVER IS LATER, MAXIMUM 270 DAYS.

The execution of these contracts eliminated the storage costs previously incurred by petitioners with respect to such grain.

Upon execution of the contracts, petitioners received total payments of $83,280.79 from the following grain elevators:

| Grain Elevator | Date | Amount |
|---|---|---|
| Blackstone Grain | 5/14/84 | $7,106.94 |
| Blackstone Grain (Cahill Division) | 5/14/84 | 40,627.54 |
| Farmers Elevator | 5/15/84 | 22,240.00 |
| Farmers Elevator | 5/16/84 | 7,115.00 |
| Blackstone Grain (Cahill Division) | 7/19/84 | 6,191.31 |

These payments represented the approximate difference, or "price spread," between the market/"bid price" per bushel then quoted by the respective grain elevators and the November 1, 1984, "futures price" quoted by the grain elevators for crops to be harvested in 1984, which "futures prices" were, in all instances, lower than the current "bid prices."

During 1984, petitioner Calvin P. Applegate took no further action with respect to the contracts and received no further payments. Petitioners reported the receipt of the payments of $83,280.79 as a short-term capital gain on their 1984 Federal income tax return.[2] Petitioners reported no other tax consequence on their 1984 Federal income tax return with respect to the contracts.

By statutory notice of deficiency, respondent determined that the payments received by petitioners were to be treated as ordinary income from the sale of grain and increased petitioners' farm rental income accordingly. Respondent further determined that, as a result of the execution of the price later contracts, petitioners' farm rental income should be increased in the amount of $463,063. Respondent arrived at this figure by multiplying the "bid price" offered by the respective grain elevators on the dates the contracts were executed by the number of

---

[2]Petitioners mistakenly reported the amount as $86,187.

bushels of grain covered by such contracts and subtracting from this product ($549,250) the cash payments received by petitioners.

By entering into the contracts, petitioners did not accept the "bid price" being offered on the date the contracts were executed. Petitioners' receipt of $83,280.79 did not reduce the amount of funds which they were otherwise entitled to receive under the contracts.

There is no established secondary market by which price later contracts are bought and sold. Such contracts, standing alone, are not normally accepted as collateral on loans. Rather, they are one item listed as an account receivable or intangible asset with an uncertain monetary value on a financial statement or balance sheet and are only partially determinative of the creditworthiness of any grain producer applying for a loan. It is unusual for a farmer holding such a contract to assign the contract rights as repayment for a debt owed. Within the Illinois banking industry, some banks accept the assignment of such a contract as repayment of a loan and some do not based upon the perceived uncertainty as to its value.

We turn first to the issue whether petitioners, not having elected out of section 453, are therefore entitled to report the sales in question as installment sales in accordance with that section. Respondent asserts that petitioners' unfettered ability to demand payment of the amount in excess of the cash payments at any time under the terms of the contracts caused the recognition of income in the amount of the cash equivalent of the fair market value of the grain on the dates the contracts were executed, with the result that all payments were received in 1984, and that section 453 is inapplicable. Petitioners counter by asserting that the execution of the contracts did not result in the recognition of any amount as income in 1984 beyond the payments actually received, and therefore the transactions qualify for reporting under the installment method of section 453. We agree with petitioners.

An "installment sale" is defined as "a disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition

occurs." Sec. 453(b)(1). In defining what constitutes "payment," section 453(f) provides in pertinent part:

SEC. 453(f). DEFINITIONS AND SPECIAL RULES.—For purposes of this section—

* * * * * * *

(3) PAYMENT.—Except as provided in paragraph (4), the term "payment" does not include the receipt of evidences of indebtedness of the person acquiring the property (whether or not payment of such indebtedness is guaranteed by another person).

(4) PURCHASER EVIDENCES OF INDEBTEDNESS PAYABLE ON DEMAND OR READILY TRADABLE.—Receipt of a bond or other evidence of indebtedness which—

(A) is payable on demand, or

(B) is issued by a corporation or a government or political subdivision thereof and is readily tradable,

shall be treated as receipt of payment.

(5) READILY TRADABLE DEFINED.—For purposes of paragraph (4), the term "readily tradable" means a bond or other evidence of indebtedness which is issued—

(A) with interest coupons attached or in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable in an established securities market), or

(B) in any other form designed to render such bond or other evidence of indebtedness readily tradable in an established securities market.

We need not dwell upon the application of section 453(f)(4)(B) or section 453(f)(5) because it is clear from the stipulation of the parties ("There is no established secondary market by which 'price later contracts' are bought and sold") that such contracts were not "readily tradable" within the meaning of paragraphs (4) and (5). See also sec. 15A.453-1(e)(4)(i), Temporary Income Tax Regs., 26 C.F.R. sec. 15A.453-1(e)(4)(i) (1981). The question is whether the contracts represent an "evidence of indebtedness * * * payable on demand" within the meaning of section 453(f)(4)(A).

An obligation shall be treated as payable on demand only if the obligation is so treated under applicable State or local law. See sec. 15A.453-1(e)(3), Temporary Income Tax Regs., 26 C.F.R. sec. 15A.453-1(e)(3) (1981).[3] Neither the parties nor the amicus curiae have cited us to any controlling State law

---

[3] See also sec. 1.453-3(c), Income Tax Regs., which applied the same rule for installment sales made before Oct. 20, 1980.

nor has our own independent research led us to a case or statute which is directly applicable to the instant case. However, we find assistance in the Illinois provisions of the Uniform Commercial Code. Chapter 26, sections 3-108 and 3-109, Ill. Ann. Stat. (Smith-Hurd 1963) (dealing with negotiable instruments), provides:

Sec. 3-108. Payable on Demand

Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated.

Sec. 3-109. Definite Time

(1) An instrument is payable at a definite time if by its terms it is payable

(a) on or before a stated date or at a fixed period after a stated date; or

(b) at a fixed period after sight; or

(c) at a definite time subject to any acceleration; or

(d) at a definite time subject to extension at the option of the holder, or to extension to a further definite time at the option of the maker or acceptor or automatically upon or after a specified act or event.

(2) An instrument which by its terms is otherwise payable only upon an act or event uncertain as to time of occurrence is not payable at a definite time even though the act or event has occurred.

Granted that commercial paper, which is governed by the foregoing provisions, is not involved herein, we see no reason why the above-quoted definitional provisions should not provide a useful guide to our interpretation of the "payable on demand" language of section 453(f)(4)(A). In the instant case, the buyers under the contracts became obligated to pay a determinable price for the grain at a definite time, i.e., 1 year after the contract date, with a right in petitioner Calvin P. Applegate to obtain payment at an earlier date. Such being the case, we are satisfied that the contracts would not be considered demand obligations under Illinois law but rather would be considered instruments payable at a definite time subject to acceleration. Cf. Ill. Ann. Stat., ch. 26, sec. 3-109(1)(c) (Smith-Hurd 1963).

We are reinforced in our conclusion that the obligations herein should not be treated as "payable on demand" by the legislative history of the predecessor of section 453(f)(3) and (f)(4), which contains substantially the same language and was enacted by the Tax Reform Act of 1969, sec. 412, Pub. L. 91-172, 83 Stat. 608. The enactment of this

provision was in response to the increased number of corporate mergers and acquisitions financed through the use of corporate bonds and debentures. The congressional aim was to prevent the use of the installment method where debentures or other securities of the purchaser received by the seller are readily marketable. Thus, S. Rept. 91-552 (1969), 1969-3 C.B. 423, 515-516, states:

> The committee agrees with the House that Congress did not originally intend the installment method to be available where the seller receives debentures or other readily marketable securities. Moreover, the committee agrees that allowing the installment method in this situation is not consistent with the purpose underlying the installment provisions. The installment method of reporting gain presumably was initially made available because of the view that where the seller received a debt obligation he did not have cash in hand, or the equivalent of cash, which would provide him with funds to pay the tax due on the gain. Debentures, however, in most cases can be readily traded on the market and therefore are a close approximation of cash. Thus, the problem of the seller not having the cash with which to pay the tax due would not appear to be present where he receives debentures or other readily marketable securities.

> \* \* \* \* \* \* \*

> \* \* \* the House bill and the committee amendments provide that for purposes of the installment method of reporting gains on sales of real property and casual sales of personal property, certain types of indebtedness are to be treated as payments received in the year of sale. Thus, these types of bonds or debentures are to constitute income to the seller in the year of sale and also are to be taken into account for purposes of the requirement which denies use of the installment method where more than 30 percent of the sales price is received in the year of sale.

> The type of indebtedness to be treated in this manner are bonds or debentures with interest coupons attached, in registered form, or in any other form designed to make is [sic] possible to readily trade them in an established securities market. Bonds or debentures are to be considered designed to be readily tradeable if steps necessary to create a market for the security are taken at the time of issuance (or later, if taken pursuant to an agreement or understanding which existed at the time of issuance) or if the bonds or debentures are part of an issue which will normally be traded through brokers dealing in corporate or government securities. *Under the committee's bill this treatment is extended to an additional type of bond; namely, one which is payable on demand. The committee believes that this type of indebtedness also is essentially the equivalent of cash and should be so treated for installment sales purposes.*

> The committee amendments also provide that bonds in registered form which the taxpayer establishes will not be readily tradeable in an established securities market are not to be treated as payments received

in the year of sale, since because of their lack of ready marketability they do not possess the characteristics which would render them essentially similar to cash. A bond or debenture which will normally be traded through brokers dealing in corporate or government securities is to be treated as being readily tradeable in an established securities market.

A bond or debenture ordinarily is to be considered in registered form if it is issued in a series under a trust indenture and if it cannot be transferred without changing the ownership registration on the registration books of the corporation. *The committee does not intend that ordinary promissory notes are to be included within the category of indebtedness which is treated as payments received in the year of sale, even though it is possible for these notes to be assigned by one party to another party.*

[Emphasis added.]

Although Congress did not specifically require by statute that evidences of indebtedness "payable on demand" be marketable, it is clear to us from the foregoing that it considered the standard for determining "payment" to be whether the evidence of indebtedness had a sufficient degree of marketability.[4] Whatever the impact of the statutory provision as to fixed amount obligations payable on demand, we think the legislative history confirms that Congress did not intend to include conditional-amount contractual obligations which were not readily tradeable and which are less formalized than "ordinary promissory notes."

In view of the foregoing and given the stipulation of the parties that there was no established secondary market for the price later contracts, we conclude that such contracts were not obligations payable on demand and therefore did not constitute payment in 1984 within the meaning of section 453(f)(4)(A). Such being the case, by virtue of section 453(f)(3), see *supra* p. 701, the transactions qualify for treatment under the installment sales provisions of section 453 since, as of December 31, 1984, at least one payment was to "be received after the close of the taxable year."

We are reinforced in our conclusion that petitioners should not be held to have received payment beyond the

---

[4]The legislative history to the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, merely states:

The payments taken into account as being received in a taxable year would not include the purchaser's obligation of future payment * * * unless that obligation is a bond or other evidence of indebtedness which is either payable on demand or has been issued by a corporation or government and is readily tradable. [S. Rept. 96-1000 (1980), 1980-2 C.B. 494, 497; H. Rept. 96-1042 at 5 (1980).]

cash payments in 1984 by *Patterson v. Hightower*, 245 F.2d 765 (5th Cir. 1957), a factually similar case. In that case, the taxpayer sold cotton on call contracts. As seller, the taxpayer was given the right to have the amount he was to be paid fixed by the market price, plus or minus an agreed number of points, at a future date to be determined by him. The Court of Appeals held that, although the sales of the cotton occurred in the year the cotton was delivered, "The amount payable to the taxpayer not being certain until the time of the exercise of the call, the profits from the sales of his cotton were income to him during the year in which they were received." See 245 F.2d at 768. We are not persuaded that section 453 was intended to abrogate the applicability of the rationale of *Patterson v. Hightower* to the instant case.

Our conclusion makes it unnecessary for us to address issues involving the application of the open transaction, cash equivalence and/or constructive receipt doctrines which might apply if the contracts did not qualify for installment sale treatment under section 453—issues to which the parties have devoted the major portion of their arguments and to which existing case law is far from clear. The continued vitality of these doctrines, in light of the enactment of section 453, has been explored in the context of situations where the taxpayer has elected not to use the installment method of reporting which was otherwise available, see section 453(d), but not in the context of their application to situations where the installment method is not available. See Goldberg, "Open Transaction Treatment for Deferred Payment Sales After the Installment Sales Act of 1980," 34 Tax Law. 605 (1981); Ginsburg, "Future Payment Sales After the 1980 Revision Act," 39th Ann. N.Y.U. Inst. 43-1 (1981); and Fishman, "Revised Installment Provisions Breathe New Life Into Farmers' Deferred-payment Contracts," 54 J. Taxn. 94 (1981).

We further note that a conclusion that the installment method of reporting under section 453 would not be available to petitioners might, given the stipulated element that there was no secondary market for the contracts, lead

to a curious result. If the consequence were that the nonmarketability precluded taxability (for example, by virtue of the absence of cash equivalence), such a conclusion would produce the same result as would obtain under the installment method of reporting permitted by section 453, i.e., no taxability until payment is actually received.[5] If, on the other hand, the conclusion were that neither section 453 nor any of the aforementioned doctrines precluded taxability in the year the contracts were executed, the effect would be to equate the right to demand payment with receipt of actual payment and thereby put cash basis taxpayers on an accrual basis—a result which, at least in respect of a farmer (which the parties agree categorizes petitioners), we are not prepared to embrace without more persuasive evidence of legislative intent in respect of section 453(f)(4)(A) and in view of the fact that farmers are relieved from the requirement to use inventories and therefore the accrual method. See sec. 1.471-6 (a), Income Tax Regs.

We next address the issue of the proper characterization of the cash payments received by petitioners upon the execution of the contracts. Petitioners assert that the crop shares were not held for sale to customers in the ordinary course of their trade or business as farmers, and that consequently the crop shares are capital assets since they do not fit within any of the exceptions set forth in section 1221. Petitioners further assert that the payments represent the appreciation in the value of the crop shares as capital assets. We disagree.

Petitioners have the burden of proof as to the factual underpinnings of this issue even though the case was submitted fully stipulated. Rule 142(a); *Service Bolt & Nut Co. Trust v. Commissioner,* 78 T.C. 812, 819 (1982), affd. 724 F.2d 519 (6th Cir. 1983).

Initially, we reject petitioners' contention that, because the parties have stipulated that the $83,280.79 received at the time of the execution of the contracts did not reduce the amounts to which petitioners were otherwise entitled, that amount represented appreciation separate from the price of the crop shares and is entitled to capital gain treatment.

---

[5]Cf. sec. 1.61-4(b), Income Tax Regs., which provides that "crop shares * * * shall be included in gross income as of the year in which the crop shares are reduced to money or the equivalent of money."

We do not think the conclusion reached by petitioners follows from the stipulated fact. The payments were clearly a part of the contracts, and we are not prepared to hold that they should be characterized differently from the way in which the other payments under the contracts would be characterized. Moreover, petitioners' argument has an inherent weakness in that, if such separation existed, it could hardly be said that those payments represented the proceeds from "a sale or exchange" which is an essential precondition to capital gain treatment under section 1222.

Petitioners further argue that, in any event, the crop shares were capital assets because they were held by petitioners for investment and not for sale to customers in the ordinary course of business. The simple fact is that the record herein contains insufficient proof to sustain petitioners' contention. The only evidence as to the purpose and duration of petitioners' holding of the crop shares and the nature and extent of their efforts to sell them is that some were held from as early as 1979. Such evidence is simply not enough. Compare *Williamson v. Bowers,* 120 F. Supp. 704 (E.D.S.C. 1950). We are constrained to observe that petitioners' contention that, because of their pattern of holding, the amounts received upon the execution of the contracts should be treated as *short-term* capital gain, seriously undermines the effectiveness of their contention. Beyond the issue of burden of proof, however, petitioners have a further problem. Crop share rentals are rents and therefore "income items." *Tatum v. Commissioner,* 400 F.2d 242, 247 (5th Cir. 1968), affg. 46 T.C. 736 (1966). See *Parmer v. Commissioner,* 468 F.2d 705, 707 (10th Cir. 1972), affg. a Memorandum Opinion of this Court; *Strong v. Commissioner,* 91 T.C. 627, 638-639 (1988). Consequently, it would appear that, at least in the hands of petitioners, the crop share rentals should not be treated as capital assets.

We sustain respondent's determination that the $83,280.79 received by petitioners in 1984 constitutes ordinary income.

To reflect concessions,

*Decision will be entered under Rule 155.*