ESTATE OF MOSE SILVERMAN, DECEASED,
ROSE SILVERMAN, EXECUTRIX, AND
ROSE SILVERMAN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 21209-88.          Filed January 21, 1992.

*William Rochester,* for petitioners.
*Steven J. Foster,* for respondent.

RUWE, *Judge:*  Respondent determined a deficiency in petitioners' Federal income taxes for 1982 in the amount of $98,196.  The issue for decision is whether petitioners are entitled to use the installment method to report the gain on exchange of their shares of stock in a savings and loan association for savings accounts of another savings and loan association.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Mose Silverman and Rose Silverman were husband and wife.

Mose Silverman died in January 1983. Rose Silverman individually and as executrix of the Estate of Mose Silverman, timely filed a joint Federal income tax return for the 1982 tax year. Mrs. Silverman subsequently filed an amended 1982 return on behalf of herself and her husband on August 1, 1987. Mrs. Silverman resided in Oakland, California, at the time the petition was filed. Probate of the Estate of Mose Silverman, deceased, was conducted in California Superior Court for San Mateo County.

In 1982, Mr. and Mrs. Silverman owned 29,162 shares of stock in Olympic Savings & Loan Association (Olympic). On October 21, 1982, Coast Federal Savings & Loan Association (Coast), a federally chartered mutual savings and loan association, offered to acquire all outstanding shares of stock of Olympic in exchange for Coast savings accounts in the principal amount of $28.5487 per share.

The exchange offer provided that:

In accepting the Exchange Offer, an Olympic Savings stockholder will receive savings accounts in Coast Federal as follows:

(1) 30% of the Exchange Price paid to each stockholder will be in a withdrawable statement savings account of Coast Federal, bearing interest, commencing on the effective date of the transaction, at a rate of 5½% per annum, compounded daily, with an effective yield of 5.65%, (the "Statement Savings Account");

(2) 70% of the Exchange Price paid to each stockholder will be in a *non-withdrawable* fixed-rate six-year statement savings account of Coast Federal, bearing interest, commencing on the effective date of the transac-tion, at the rate of 6½% per annum, compounded daily, with an effective yield of 6.72%, and payable semi-annually commencing six months from the effective date of the transaction (the "Term Account").

Mr. and Mrs. Silverman accepted the Coast offer and received $249,761 principal amount of statement savings accounts, and $582,776 principal amount of term accounts in exchange for their Olympic stock. The term accounts were certificates of deposit. Mr. and Mrs. Silverman's term accounts were issued and held as follows:

| Account No.[1] | Account holder | Principal amount |
|---|---|---|
| (1) 1-710523-0 | Mose Silverman or Rose Silverman | $194,245.35 |
| (2) 1-710525-5 | Mose Silverman | 97,142.66 |

---

[1]Accounts will subsequently be referred to by the number in parentheses preceding them.

| Account No. | Account holder | Principal amount |
|---|---|---|
| (3) 1-710527-1 | Mose Silverman or Ruth Silverman TR U/A Nov. 1, 1982 | $97,122.68 |
| (4) 1-710529-7 | Rose Silverman | 97,142.66 |
| (5) 1-710531-3 | Rose Silverman or Ruth Silverman TR U/A Nov. 1, 1982 | 97,122.68 |

Mr. and Mrs. Silverman received a passbook for each account issued. These passbooks were basically identical to those evidencing any other account at Coast. If a passbook represented a certificate of deposit, the passbook stated that it was a "certificate of deposit". All Coast's passbooks stated on the first page that they were "Not transferable except on the books of the Association." The only situation in which title to one of Coast's certificates of deposit could be changed was if the owner or one of the joint owners died. In such a case, title would be vested in the executor or administrator of the decedent's estate.

The passbooks evidencing the term accounts received in the exchange, in addition to stating they were certificates of deposit, contained the following language: "Per Stock Exchange Offer." This language indicated that, in addition to the usual restrictions on certificates of deposit, the account was subject to the terms of the exchange offer. Pursuant to the exchange offer, no part of the principal amount of the term accounts could be withdrawn for 6 years from the effective date of the exchange. Interest, payable semiannually, could be withdrawn during the term of the account. Finally, holders of the term accounts were limited with respect to the amounts they could borrow against the accounts as follows:

B. Term Accounts. Term Accounts may not be pledged as security for a "share loan" until one year following the effective date of the transaction. Starting at the first anniversary of the effective date, however, the owner of the Term Account will be entitled to borrow, through the vehicle of a "share loan" secured by the Term Account, at an interest rate of 8½%, with a minimum loan term of three months, up to a total of:

(1) 18% of the initial principal amount of the Term Account during the second year of the account's term.

(2) 36% of the initial principal amount of the Term Account during the third year of the account's term.

(3) 54% of the initial principal amount of the Term Account during the fourth year of the account's term.

(4) 72% of the initial principal amount of the Term Account during the

fifth year of the account's term.

(5) 90% of the initial principal amount of the Term Account during the sixth year of the account's term.

The exchange was effective and the term accounts were issued to Mr. and Mrs. Silverman on November 22, 1982.

The term accounts were not readily tradable in an established securities market.

Mose Silverman's last will and testament (the will) provided that the residue of his estate, which included the Coast term accounts, was to go to Mrs. Silverman and Tommy F. Angell, an attorney, in trust for the benefit of Mrs. Silverman for her life and the balance to their daughter Ruth Elaine Silverman upon Mrs. Silverman's death. Probate of the Estate of Mose Silverman was concluded pursuant to an order of the California Superior Court on July 3, 1984.

On August 10, 1984, term account (1) was closed and the balance transferred into two new term accounts. The first account, in the amount of $95,615.53, was opened in the name of Rose Silverman and Tommy F. Angell, Trustees Under the Will of Mose Silverman (1-711315-0), and a second account, in the amount of $100,000, was established in the name of Rose Silverman as Executor of the Estate of Mose Silverman (1-711309-3). Pursuant to the order of the Probate Court, the two newly opened accounts and the two previously issued accounts under the name of Mose Silverman (term accounts (2) and (3) above) were revested in the name of Rose Silverman and Tommy F. Angell, Trustees Under the Will of Mose Silverman.

On their original 1982 return, Mr. and Mrs. Silverman treated the exchange as a nontaxable exchange pursuant to a corporate reorganization. In 1985, the U.S. Supreme Court, in *Paulsen v. Commissioner,* 469 U.S. 131 (1985), held that an exchange, very similar to the Coast/Olympic exchange, was not a tax-free corporate reorganization. On August 1, 1987, an amended return for 1982 was filed reporting the exchange of the Olympic stock for Coast accounts as an installment sale, treating the statement savings accounts as payment received, and the term accounts as the deferred payment obligation. Federal income tax was paid on the gain attributable to the $249,761 principal amount of the statement savings accounts.

On June 23, 1988, respondent issued a statutory notice of deficiency to petitioners with respect to taxable year 1982

treating the stock exchange as a fully taxable exchange.

OPINION

Respondent contends that Mr. and Mrs. Silverman were required to include the entire gain on disposition of their Olympic stock in their 1982 income. Petitioners concede that the exchange is not entitled to treatment as a tax-free reorganization. They argue, however, that the gain on the exchange may be reported on the installment method. We must decide whether the Silvermans were entitled to report the exchange under the installment method.

Section 1001(a)[1] provides that the gain from the sale of property shall be the excess of the amount realized therefrom over the adjusted basis. Amount realized is defined as the sum of any money received plus the fair market value of property (other than money) received. Sec. 1001(b).[2] All gain realized under section 1001 must be recognized absent a statutory exception. Sec. 1001(c).

Section 453 provides such an exception. It allows income from an installment sale to be reported in the year "payment" is received. The amount of income to be recognized for any taxable year is the "proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price." Sec. 453(c).

An "installment sale" is defined as "a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs." Sec. 453(b)(1). Generally, and for purposes of this case, the term "'payment' does not include the receipt of evidences of indebtedness of the person acquiring the property". Sec. 453(f)(3).[3]

Mr. and Mrs. Silverman disposed of property (Olympic stock) to Coast. Coast was thus "the person acquiring the property".

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]There is no question that the term accounts in the instant case constitute property within the meaning of sec. 1001.

[3]The only exception to this general rule occurs when the purchaser's evidence of indebtedness is payable on demand or readily tradable in an established securities market. Sec. 453(f)(4) and (5). It is clear that the term account certificates were not payable on demand, and it is undisputed that they were not readily tradable in an established securities market.

In return, the Silvermans received withdrawable statement savings accounts and term accounts that could not be withdrawn for 6 years. If the Coast term accounts which Mr. and Mrs. Silverman received in the exchange are "evidences of indebtedness of the person acquiring the property", then Mr. and Mrs. Silverman's receipt of the term accounts would not constitute "payment" for purposes of section 453, and they would therefore be entitled to report the disposition of their Olympic stock on the installment method.[4]

Whether certificates of deposit are "evidences of indebtedness" of the issuing savings and loan association was answered by the Supreme Court in *Paulsen v. Commissioner,* 469 U.S. 131 (1985). In that case, involving practically identical facts, the Court was called upon to determine whether a transaction wherein the taxpayer received savings accounts and certificates of deposit from a federally chartered mutual savings and loan association in exchange for stock in a State-chartered savings and loan association, qualified as a tax-free reorganization under sections 354(a)(1) and 368(a)(1)(A). One requirement for such a tax-free exchange was that the taxpayer's ownership in the prior organization must continue in a meaningful fashion in the reorganized enterprise, i.e., "the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes." *Pinellas Ice & Cold Storage Co. v. Commissioner,* 287 U.S. 462, 470 (1933); *Paulsen v. Commissioner,* 469 U.S. at 136. In *Paulsen,* the Court recognized that the certificates of deposit had both "equity and debt characteristics", *Paulsen,* 469 U.S. at 138, but found that the debt characteristics predominated, and that the equity characteristics were insubstantial.

there are substantial debt characteristics to the Citizens shares that predominate. Petitioners' passbook accounts and certificates of deposit are not subordinated to the claims of creditors, and their deposits are not considered permanent contributions to capital. Shareholders have a right on 30 days' notice to withdraw their deposits, which right Citizens is obligated to respect. While petitioners were unable to withdraw their funds for one year following the merger, this restriction can be viewed as akin to a delayed

---

[4]The withdrawable statement savings accounts are "payments" for purposes of sec. 453, whether or not they are considered evidences of indebtedness of the purchaser, because they were "payable on demand". See sec. 453(f)(3) and (4).

payment rather than a material alteration in the nature of the instruments received as payment. * * *

In our view, the debt characteristics of Citizens' shares greatly outweigh the equity characteristics. The face value of petitioners' passbook accounts and certificates of deposit was $210,000. Petitioners have stipulated that they had a right to withdraw the face amount of the deposits in cash, on demand after one year or at stated intervals thereafter. Their investment was virtually risk free and the dividends received were equivalent to prevailing interest rates for savings accounts in other types of savings institutions. The debt value of the shares was the same as the face value, $210,000; because no one would pay more than this for the shares, the incremental value attributable to the equity features was, practically, zero. * * *

[*Paulsen v. Commissioner, supra* at 139, 140.]

We perceive no meaningful distinction between the certificates of deposit in *Paulsen* and those involved here.[5] The certificates of deposit received by Mr. and Mrs. Silverman represent "evidences of indebtedness" of the person acquiring their property. Petitioners meet all of the literal statutory requirements of section 453 so as to entitle them to report income from the disposition of Olympic stock using the installment method.[6]

Respondent argues that the term accounts are "cash equivalents" and therefore must be included in income in the year of sale. Respondent points out that the Court in *Paulsen* characterized the accounts as cash equivalents. *Paulsen v. Commissioner, supra* at 140.

We have previously held that a finding that a taxpayer is entitled to installment sale reporting makes it unnecessary for us to address issues involving the application of the cash equivalence doctrine. *Applegate v. Commissioner*, 94 T.C. 696, 705 (1990). However, since respondent relies heavily upon the cash equivalence argument and application of that doctrine is far from clear, *Applegate*, 94 T.C. at 705, we will examine respondent's position.

---

[5]The certificates of deposit in the instant case were not payable for 6 years whereas those in *Paulsen* could be withdrawn in 1 year. If anything, this emphasizes the "delayed payment" aspects of the Silvermans' certificates of deposit.

[6]In *Paulsen v. Commissioner*, 469 U.S. 131 (1985), the Supreme Court did not address the issue of whether the taxpayer's gain could be reported under sec. 453. Likewise, neither of the lower court opinions mention the installment sale provisions. *Paulsen v. Commissioner*, 716 F.2d 563 (9th Cir. 1983), revg. 78 T.C. 291 (1982). We note that *Paulsen* involved the taxable year 1976 and that for years prior to the enactment of the Installment Sales Revision Act of 1980, taxpayers were required to elect use of the installment method. See S. Rept. 96-1000 (1980), 1980-2 C.B. 494.

Gain from a sale or exchange is realized pursuant to section 1001. "There has been a host of cases involving the question of when an amount is realized for purposes of section 1001. In a number of cases, this Court has held that an amount is realized when a seller receives property which is the equivalent of cash." *Griffith v. Commissioner,* 73 T.C. 933, 937 (1980) (citing *Watson v. Commissioner,* 69 T.C. 544, 549 (1978), affd. 613 F.2d 594 (5th Cir. 1980); *Western Oaks Building Corp. v. Commissioner,* 49 T.C. 365, 376 (1968); *Ennis v. Commissioner,* 17 T.C. 465, 470 (1951); *Estate of Atkins v. Commissioner,* 9 B.T.A. 140, 150 (1927), affd. 36 F.2d 611 (D.C. Cir. 1929)). An obligation is a cash equivalent if it is of a solvent obligor, unconditional, assignable, not subject to set-offs, and is of a kind that is frequently transferred to lenders or investors at a discount not substantially greater than the generally prevailing premium for the use of money. *Cowden v. Commissioner,* 289 F.2d 20, 24 (5th Cir. 1961), revg. 32 T.C. 853 (1959); *Watson v. Commissioner,* 69 T.C. 544, 551-552.

In *Warren Jones Co. v. Commissioner,* 524 F.2d 788 (9th Cir. 1975), revg. 60 T.C. 663 (1973), the Circuit Court to which the instant case would be appealable reversed this Court's holding that the fair market value of a contract was not includable in the amount realized from a sale. We had held that the contract was not a cash equivalent because it could not have been transferred to a lender or investor at a discount which was not substantially greater than the generally prevailing premium for the use of money. (The discount factor was found to be approximately 42 percent.) After an analysis of the evolution of the language of section 1001, the accompanying legislative history, and the case law of that circuit, the Ninth Circuit held that if the fair market value of a contract can be ascertained, the ascertainable fair market value must be included as an amount realized under section 1001(b). Consequently, under *Warren Jones Co.,* whether gain is or is not realized under section 1001 upon receipt of purchaser's debt obligation depends on whether the obligation has an ascertainable fair market value, regardless of the size of the discount.[7]

---

[7]The Ninth Circuit's approach has been described as a different view of the cash equivalence doctrine. See Gertzman, Federal Tax Accounting, par. 3.03[1][d] at 3-15 (1988). The Ninth Circuit expressed the view that its holding does not conflict with the Fifth Circuit's view in *Cowden v. Commissioner,* 289 F.2d 20 (5th Cir. 1961), revg. 32 T.C. 853 (1959). *Warren Jones Co. v. Commissioner,* 524 F.2d 788, 794 n.9 (9th Cir. 1975), revg. 60 T.C. 663 (1973).

The result of satisfying either the cash equivalence or the ascertainable fair market value tests is that gain is realized under section 1001(b). See *Warren Jones Co. v. Commissioner, supra* at 791 n.6. Petitioners do not dispute that gain was realized in 1982. Such realized gain under section 1001 must be recognized absent a statutory exception, but, as previously pointed out, section 453 provides such an exception. A finding that a transaction may be reported under section 453 assumes there has been a realization event and makes any further consideration of the cash equivalence doctrine redundant. See *Warren Jones Co. v. Commissioner,* 68 T.C. 837 (1977), affd. 617 F.2d 536 (9th Cir. 1980).[8] Thus, despite the inclusion of the value of the buyer's obligation in the amount realized under section 1001(b), a taxpayer is entitled to report gain from the transaction under the installment method. *Warren Jones Co. v. Commissioner,* 524 F.2d 788 (9th Cir. 1975).

The legislative history of section 453 indicates that Congress believed that the cash equivalence characteristics of certain types of debt instruments made it inappropriate to allow them to be reported under the installment method. As a result, it enacted specific provisions to preclude certain debt instruments from being reported under the installment method. See S. Rept. 91-552 (1969), 1969-3 C.B. 423, 515. These provisions, section 453(f)(4) and (5), first became part of the installment sale section in 1969 as paragraph 453(b)(3). These paragraphs provide:

(3) PAYMENT.—Except as provided in paragraph (4), the term "payment" does not include the receipt of evidences of indebtedness of the person acquiring the property (whether or not payment of such indebtedness is guaranteed by another person).

---

[8] Our conclusion that the installment method is available to petitioners regardless of the "cash equivalence" or ascertainable fair market value of the term accounts appears to be consistent with the position that respondent argued in this Court in *Warren Jones Co.*:

*Respondent contends that the real estate contract has an ascertainable fair market value, is readily marketable, and is the equivalent of cash.* He argues that it is "property (other than money)" under section 1001(b), I.R.C. 1954, and, to the extent of its fair market value, constitutes an amount realized by the petitioner in the year of sale. Thus respondent asserts that the petitioner should not be permitted to defer the reporting of gain from the sale until cash payments received under the contract exceed the adjusted basis of the property sold. *Respondent acknowledges, however, that petitioner's election (claimed alternatively) to use the installment method of reporting gain under section 453 is proper.* [*Warren Jones Co. v. Commissioner,* 60 T.C. at 663, 666 (1973); fn. ref. omitted; emphasis added. See also *Estate of Wiggins v. Commissioner,* 72 T.C. 701, 709 (1979).]

(4) PURCHASER EVIDENCES OF INDEBTEDNESS PAYABLE ON DEMAND OR READILY TRADABLE.—Receipt of a bond or other evidence of indebtedness which

    (A) is payable on demand, or

    (B) is issued by a corporation or a government or political subdivision thereof and is readily tradable,

shall be treated as receipt of payment.

(5) READILY TRADABLE DEFINED.—For purposes of paragraph (4), the term "readily tradable" means a bond or other evidence of indebtedness which is issued—

    (A) with interest coupons attached or in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable in an established securities market), or

    (B) in any other form designed to render such bond or other evidence of indebtedness readily tradable in an established securities market.

These provisions were a Congressional response to the increasing number of acquisitive corporate reorganizations in which shareholders received corporate debentures for shares. Such an exchange was not exempt from taxation under the sections of the Code governing reorganizations, but tax deferral could otherwise be secured under section 453.

The Senate Finance Committee report stated:

Debentures, however, in most cases can be readily traded on the market and therefore are a close approximation of cash. Thus, the problem of the seller not having the cash with which to pay the tax due would not appear to be present where he receives debentures or other readily marketable securities. [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 515.]

Consequently, Congress directed that certain types of indebtedness be treated as payment received in the year of sale. S. Rept. 91-552 at 516.

The type of indebtedness to be treated in this manner are bonds or debentures with interest coupons attached, in registered form, or in any other form designed to make it possible to readily trade them in an established securities market. * * * [S. Rept. 91-552 at 516.]

However, the report goes on to state that:

The committee amendments also provide that bonds in registered form which the taxpayer establishes will not be readily tradeable [sic] in an established securities market are not to be treated as payments received in the year of sale, since because of their lack of ready marketability they do not possess the characteristics which would render them essentially similar to cash. [S. Rept. 91-552 at 516.]

Therefore, while Congress has created an exception to installment reporting based on the cash equivalence

characteristics of certain obligations, it specifically enumerated the type of debt obligations which fell within the exception. We conclude that cash equivalence is not an exception to the installment method except as specifically provided in the statute. The term accounts in issue in this case were not readily tradable in an established securities market, and, thus, were not within the aforementioned statutory exception.

Respondent contends, in the alternative, that the Silvermans received the present economic benefit of full payment when they received the term accounts, and, therefore, must recognize the gain realized in the year of sale. In doing so, he relies on *Rushing v. Commissioner,* 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969).

a taxpayer certainly may not receive the benefits of the installment sales provisions if, through his machinations, he achieves in reality the same result as if he had immediately collected the full sales price, * * *. As we understand the test, in order to receive the installment sale benefits the seller may not directly or indirectly have control over the proceeds or possess the economic benefit therefrom. * * * [*Rushing v. Commissioner, supra* at 598.[9]]

During 1982, the Silvermans never possessed the right to receive payment of the amounts represented by the term accounts. The term accounts were not withdrawable until 1988, were not readily tradable in an established securities market, and were not assignable except upon the death of a joint owner, in which case title could only be vested in the decedent's personal representative or the surviving joint owner. The passbooks evidencing the accounts stated on their face that transferability was limited. In short, it is difficult to see how the Silvermans received the economic benefits of payment when the term accounts could not be withdrawn, sold, or borrowed against during the year in issue.[10]

Respondent relies on *Pozzi v. Commissioner,* 49 T.C. 119 (1967), in support of his argument that the economic benefit associated with receipt of "payments", such as the term

---

[9]We note that the "determinative question" in *Rushing* was whether the taxpayers "constructively received" the amounts in the year in issue. *Rushing v. Commissioner,* 441 F.2d 593, 597 (5th Cir. 1971), affg. 52 T.C. 888 (1969). Respondent concedes that petitioners were not in "constructive receipt" of payment for the shares sold.

[10]The term accounts could be borrowed against, in limited amounts, in subsequent years.

accounts, has been uniformly held to disqualify a transaction from installment sale treatment. Respondent's reliance is misplaced. *Pozzi* is one of a series of cases in which installment sale treatment was denied where factual analysis led to the conclusion that the sellers were no longer looking to the purchaser for payment, but, instead, expected to collect from funds which the purchasers had placed in escrow with a third party. *Griffith v. Commissioner,* 73 T.C. 933 (1980); *Oden v. Commissioner,* 56 T.C. 569 (1971); *Pozzi v. Commissioner, supra; Trivett v. Commissioner,* T.C. Memo. 1977-161, affd. 611 F.2d 655 (6th Cir. 1979); cf. *Porterfield v. Commissioner,* 73 T.C. 91 (1979). The instant case is clearly distinguishable from the facts of these cases.

In *Pozzi v. Commissioner, supra,* a buyer sought to purchase a business for cash but the taxpayer refused. The taxpayer proposed an installment sale and the buyer accepted. The buyer opened an escrow account with cash equaling the purchase price. As each payment came due, the buyer sent a check to the escrow bank, the bank drew a check on itself in favor of the taxpayer and returned the same amount to the buyer out of the escrow account. We held that the transaction was indistinguishable from one in which the taxpayer collected the full purchase price at the time of sale and deposited it in his own account.

The taxpayers in *Oden v. Commissioner, supra,* agreed to sell certain real and personal property in 1963 for a total consideration of $364,457. On the closing date, the buyer made a downpayment of $23,000 and executed promissory notes for the balance. The agreement to sell provided that the promissory notes would be secured by certificates of deposit, each certificate having a principal amount and maturity date corresponding to the principal amount and maturity date of each installment of the notes. The certificates were placed in an escrow account.

The escrow agreement provided that the buyer would issue a check to the escrow bank as each installment matured; the bank would then forward a cashier's check to the taxpayers and release the matured certificate of deposit to the buyer. This procedure was not followed. In actuality, the normal practice was for the escrow bank simply to pay the installments directly to the taxpayers, without regard to

whether or not the buyer was in default. We quoted respondent's argument on brief as follows:

Here we do not have a true obligation of the purchaser. On the contrary, his obligation was fully met at the time he purchased the certificates of deposit and endorsed them in blank. The petitioners thus received not an obligation of the purchasers but a right to the certificates of deposit. The certificates had value on the date of sale. This value would probably be the face amount but in any event would certainly be in excess of 30% of the face amount. Thus petitioners would have received cash or its equivalent in an amount in excess of 30% of the purchase price. [*Oden v. Commissioner, supra* at 574.]

The taxpayers argued that the fact that certificates of deposit were placed in escrow as security for payment of the notes does not prevent installment method treatment. We agreed that the taxpayers' position was legally correct, however, we found that:

Petitioners were not looking to the certificates of deposit merely as security in case of default by the buyers on their obligations. They knew and contemplated that as each certificate matured, the principal amount thereof would be paid to them irrespective of whether * * * [buyer] was in default. We conclude that, in substance, petitioners did not regard * * * [buyer] as being indebted to them, for the buyers had met their obligation in full when they purchased the certificates of deposit in 1963. Petitioners were not relying upon the * * * [buyer's] notes, but upon the certificates of deposit to serve as payments in connection with the sale. [*Oden v. Commissioner, supra* at 576.]

We, therefore, held that the taxpayers were not entitled to report the transaction under the installment method.

In *Griffith v. Commissioner, supra,* sellers of cotton were disqualified from the use of section 453 where the balance due under a sales contract was ostensibly "secured" by a bank's irrevocable letter of credit. The letter of credit was issued after the purchaser provided the issuing bank with certificates of deposit equal to the purchaser's obligation. Our conclusion in *Griffith* was premised on our finding that, in substance, the letter of credit functioned not merely as security for an existing obligation of the purchaser, but rather as an economic substitute for the buyer's obligation. In so holding, we explained the difference between securing the payment of a purchaser's evidence of indebtedness and substituting other property for the purchaser's evidence of indebtedness.

*Oden v. Commissioner,* 56 T.C. 569 (1971), involved a sale of real estate in which the agreement provided that the price was to be paid in installments,

but an escrow arrangement was established. After carefully analyzing the facts, we concluded the seller was no longer looking to the purchaser for the payment; rather, the seller expected to collect from the certificates of deposit which had been placed in escrow. As a result, we held that the seller had received a payment in excess of 30 percent of the selling price in the year of sale and therefore was not entitled to elect to use the installment method. See *Williams v. United States,* 219 F.2d 523 (5th Cir. 1955); *Pozzi v. Commissioner,* 49 T.C. 119 (1967). On the other hand, in *Porterfield v. Commissioner,* 73 T.C. 91 (1979), which involved a somewhat similar arrangement, we found that, despite the escrow arrangement, the seller expected to collect from the purchaser and that the escrow arrangement merely served as security for the performance by the purchaser. Accordingly, we held in *Porterfield* that the seller could use the installment method.

The standby letter of credit in this case is similar to the escrow arrangement in *Oden.* Although the petitioners were required first to seek payment from Dunavant, they could collect from First National if Dunavant did not pay merely by preparing a certification to that effect. We are not satisfied that the petitioners regarded the letter of credit merely as security for the obligation of Dunavant; it seems that the letter of credit in this case served the same economic effect as the escrow arrangement in *Oden.* * * *

[*Griffith v. Commissioner,* 73 T.C. at 943.]

Unlike the instant case, in each of the above cases the transaction involved a party other than the buyer and the seller. The purchasers parted with the full amount of the purchase price in the year of sale, either by furnishing certificates of deposit or cash. Thus, in those cases, the purchaser had fully extinguished its payment obligation in the year of sale. In reality, the seller was not looking to or relying on the "indebtedness of the person acquiring the property" in order to receive payment. Instead, the seller-taxpayer had received the obligation of a third party to whom he was looking to collect. Evidence of the obligation of a third party is not excluded from the definition of the term "payment" for purposes of section 453.

Unlike the aforementioned cases, the Silvermans never looked to anyone or anything other than the Coast term accounts for payment of Coast's obligation. The fact that the obligor here is a savings and loan association, and the obligation is a certificate of deposit, does not affect our analysis. It is the substance of the transaction that governs its tax consequences not the labels applied to the obligations by the parties, *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945), and it is clear that the term accounts represented a debt of the purchaser. *Paulsen v. Commissioner,* 469 U.S. 131 (1985).

Respondent cites section 15A.453-1(b)(3)(i), Temporary Income Tax Regs., 46 Fed. Reg. 10710 (Feb. 4, 1981), which provides that the "Receipt of an evidence of indebtedness which is secured directly or indirectly by cash or a cash equivalent, such as a bank certificate of deposit or a treasury note, will be treated as the receipt of payment." Respondent contends that if the "receipt of an evidence of indebtedness, which is generally not recognized as the receipt of a payment for section 453 purposes, must be recognized as the receipt of a payment when it is secured by a certificate of deposit or some other cash equivalent, *a fortiori* the receipt of the certificates of deposits or cash equivalent must be recognized as the receipt of payments for section 453 purposes."

First, we have already disposed of the doctrine of cash equivalence. Second, we note, and respondent is aware, that the quoted regulation is not properly applicable to the facts of the instant case. The obligations of Coast to petitioners in the form of certificates of deposit were not "secured" with cash or a cash equivalent. However, even if they were, it has been long settled that secured debts stand on the same plane as unsecured debts for purposes of the installment sale limitation on year-of-sale payments. *Sprague v. United States,* 627 F.2d 1044, 1047 (10th Cir. 1980); *Oden v. Commissioner, supra* at 575.

As the court in *Sprague* pointed out:

> The value or cash-equivalency of the security cannot adequately serve as criterion in the present context. It would be impractical for the taxpayer and the IRS to evaluate a security and determine whether its "quality" was such as to create some indeterminate and indeterminable level of risk that the note payee would or would not get paid. Moreover, consideration of the "quality" of security would unfairly penalize those most careful and successful in protecting themselves against buyer default; who would thereby disqualify themselves from the tax advantages of installment reporting. [*Sprague v. United States, supra* at 1048.]

The relevant inquiry is whether, in substance:

> The purchaser sheds his obligation by irrevocably placing in escrow sufficient cash or its equivalent to pay the full amount of his debt to the seller. At that point, the transaction is essentially complete for the purchaser, who has no further interest in it. The escrow agent becomes a substitute obligor if, at the time of sale, the seller is able to look to the escrowed funds for unconditional periodic payment of the purchase price. [*Sprague v. United States, supra* at 1049-1050; fn. ref. omitted.]

Here, petitioners rely only on the purchaser and the purchaser's obligation for payment. The legislative history of the Installment Sales Revision Act of 1980 cites *Sprague* approvingly and states the following in explanation of its amendment to section 453(f)(3) as follows:

*Explanation of provision*

Under the bill, a third party guarantee (including a standby letter of credit) will not be taken into account in determining if the buyer's evidence of indebtedness constitutes payment to the seller. For this purpose, a guarantee which is not treated as payment would not include a third party note (or any other type of third party obligation which is transferable or marketable prior to default in payment by the installment purchaser). [S. Rept. 96-1000, 1980-2 C.B. 494, 503-504.]

Finally, the fact that the accounts were insured does not bring them within the definition of "payment". Section 453(f)(3) provides that unless readily tradable or payable on demand, payment does not include purchaser evidences of indebtedness "(whether or not payment of such indebtedness is guaranteed by another person.)" Section 15A.453-1(b)(3), Temp. Income Tax Regs., also provides that "the term 'payment' does not include the receipt of evidences of indebtedness of the person acquiring the property ('installment obligation'), whether or not payment of such indebtedness is guaranteed by a third party (including a government agency)."

We find that the Silvermans did not receive the economic benefit of payment of the sales price of their stock in 1982 when they received the term accounts. We hold that petitioners were entitled to report the transaction using the installment method. This result is consistent with the Congressional objective in enacting section 453 which was to relieve taxpayers from having to pay tax in the year of sale based on the full amount of anticipated profits when they had received in cash only a portion of the sales price.[11]

*Decision will be entered for petitioners.*

---

[11]*Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948); H. Rept. 96-1042, at 5 (1980); identical language appears at S. Rept. 96-1000, at 7 (1980), 1980-2 C.B. 494, 497.